### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| ROBERT ADAIR, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br> v.<br><br>EQT PRODUCTION COMPANY, ARLIE J. LAMBERT & ANN P. LAMBERT, RAYMOND LOFTIN & LINDA LAMBERT LOFTIN, G. WORTH PEGRAM, JR. & BERNICE LAMBERT PEGRAM, ARTHUR AMOS & ABBIE LAMBERT AMOS, JERRY SHORT & ROSE LAMBERT SHORT, HARRIS McGIRT & JOAN LAMBERT McGIRT, GREG LAMBERT, C. W. DOTSON & MARY FRANCES L. DOTSON, OCIE G. SUTHERLAND, DENNIS SUTHERLAND & CHARLOTTE SUTHERLAND, DON RAINEY & LINDA CAROL RAINEY,  LAMBERT LAND LLC, and JOHN DOES A-Z,<br><br>    Defendants. | Case No. 1:10-cv-00037<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**Trial By Jury Requested** |

Comes now the Plaintiff, by and through counsel, and, pursuant to Fed. R.Civ. P. Rule 15(a)(1)(B), which authorizes Plaintiff to amend his complaint within 21 days after service of Defendants' Motion to Dismiss (Doc. 9, July 6, 2010), states as follows for his Amended Class Action Complaint against Defendants:

### INTRODUCTION

1. This case is brought on behalf of certain owners of gas interests in Buchanan, Dickenson, Lee, Russell, Scott and Wise Counties, Virginia ("the Class"). Plaintiff and the Class Members are the owners of gas estates/interests in tracts that are included in coalbed methane gas

drilling units operated by EQT Production Company ("EQT"), and have been identified by EQT in filings with the Virginia Gas and Oil Board ("Board") as having claims to the ownership of coalbed methane gas ("CBM") that conflict with the owners of coal estates/interests in the tracts.

2.     The Coal Owner Defendants listed in paragraphs 13 - 25, below, are the owners of coal estates/interests in tracts that are included in CBM drilling units operated by EQT, and have been identified by EQT in filings with the Board as having claims to the ownership of CBM that conflict with the owners of gas estates/interests in the tracts, including Plaintiff and the Class Members.

3.     For years, EQT, as the operator of CBM wells/units located in the Subject Virginia Counties, has produced and sold substantial quantities of CBM that are attributable to Plaintiff's and the Class Members' gas ownership interests, and has never properly accounted to Plaintiff and the Class Members for same.

4.     EQT has taken possession of and sold CBM attributable to Plaintiff's and the Class Members' gas interests by taking undue and/or unlawful advantage of certain provisions of the Virginia Gas and Oil Act, VA. CODE ANN. § 45.1-361-1, *et seq.* ("the Gas Act"), that permit the production and sale of CBM in the face of "conflicting claims" of CBM ownership.  EQT repeatedly asserted that there were conflicting CBM ownership claims as between gas owners (the Class), on the one hand, and coal owners (the Coal Owner Defendant), on the other hand, and EQT instituted proceedings before the Board that resulted in the entry of orders that pooled all interests or estates in CBM drilling units, appointed EQT as operator of the CBM units, and -- critical to this lawsuit -- provided that Plaintiff and the Class Members were "deemed, subject to a final legal determination of ownership," to have leased their CBM interests in the units to EQT, the CBM Unit operator. *See* VA. CODE ANN. §45.1-361.22(6).

5.      EQT thereupon proceeded to produce and sell CBM attributable to Plaintiff's and the Class Members' interests, and was obligated, under §45.1-361.22 of the Gas Act, to place the proceeds attributable to Plaintiff's and the Class Members' interests into escrow, pending judicial resolution of the "conflicting claims" of CBM ownership.  Such monies have never been paid to Plaintiff and the Class Members.

6.      EQT deprived Plaintiff and the Class Members of CBM production and/or production revenues attributable to Plaintiff's and the Class Members' interests by claiming that the Coal Owner Defendants own the CBM as a result of their coal ownership interests and/or that EQT had the right to take possession of and sell the CBM as the Coal Owner Defendants' lessee.

7.      EQT's claims and course of conduct are unfounded and contrary to the law.  The Virginia Supreme Court held six years ago that CBM "is a distinct mineral estate" from coal, and that landowners retain the rights to CBM located on their property when they convey or lease coal rights.  *Harrison-Wyatt, LLC v. Ratliff*, 593 S.E.2d 234, 238, 267 Va. 549, 556 (2004).  A new state law codifies the *Ratliff* rule.  VA. CODE ANN. § 45.1-361.21:1:  "A conveyance, reservation, or exception of coal shall not be deemed to include coalbed methane gas."  Therefore, controlling statutory and common law in Virginia holds that Plaintiff and the Class Members own the CBM that is produced from the lands in which they own gas interests, and that the Coal Owner Defendants do not own the CBM.

8.      The "deemed leases" imposed on the Class Members were conditionally imposed, in that those "leases" are, in accordance with VA. CODE ANN. § 45.1-361.22(6), "subject to a final legal determination of ownership."  Plaintiff requests this Court make that ownership determination.

9.     Plaintiff's primary goal in this case is to obtain from this Court the "final legal determination of ownership" that the statute requires, which -- under the plain language of the Gas Act -- would nullify Plaintiff's and Class Members' deemed leases.  The ownership determination would have substantial benefits to Plaintiff and the Class Members, including entitling them to finally receive the many years' worth of their money that has been held in escrow or retained by EQT as a result of ownership conflicts that do not exist.

10.     On behalf of the Class, Plaintiff seeks a judgment to establish – among other things – that:

a.     Plaintiff and the Class Members -- not Defendants -- are the owners of the CBM that is attributable/allocated to those CBM Unit tracts as to which EQT has asserted there are conflicting claims of CBM ownership between Plaintiff and Class Members (as gas owners), on the one hand, and the Coal Owner Defendants (as coal owners), on the other hand;

b.     The CBM leases that EQT has entered, as lessee, with Coal Owner Defendants, as lessors, are void and of no force and effect as to the CBM Unit tracts in which Plaintiff's and the Class Members' gas interests are included, because as a matter of law the Coal Owner Defendants do not own the CBM, and therefore they have no CBM production rights to lease to EQT;

c.     EQT, as the CBM Unit operator, must account to Plaintiff and the Class Members as unleased mineral owners, e.g., on an eight-eighths (8/8ths) basis, net of operational expenses, and do so as to both past production and future production;

d.     All proceeds attributable to Plaintiff's and the Class Members' CBM interests must be released from escrow to Plaintiff and the Class Members;

e.     EQT must account for the methodology it used to calculate the escrowed proceeds, must prove that it sold the CBM at the highest price obtainable and otherwise calculated the proceeds (8/8ths, net of operational expenses) properly, and must pay over to Plaintiff and the Class Members any

proceeds EQT calculated improperly or failed to deposit into escrow; and

f.    If the "deemed lease" provisions of the Gas Act are not interpreted as written but are instead interpreted to confine and limit Plaintiff's and the Class Members' rights and remedies to the recovery of past and/or future proceeds based only on a 1/8th net proceeds "deemed lease" royalty interest, then those statutory provisions, as so interpreted and applied, must be held to be an unconstitutional taking and transfer of Plaintiff's and the Class Members' valuable CBM rights, interests and properties to EQT, for private purposes, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 11 of the Virginia Constitution; or alternatively, the deemed lease royalty provisions ("1/8th net proceeds" royalty rate and paltry cash bonuses of $1.00 per acre and $5.00 per acre) established by the Gas Act and/or by the provisions of CBM Unit pooling orders issued by the Board, constitute an unconstitutional taking without adequate or just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and in violation of Article I, Section 11 of the Virginia Constitution; and -- in either event -- the deemed leases EQT seeks to impose must be declared void and unenforceable and EQT must account to Plaintiff and the Class Members as unleased mineral owners and must disgorge and pay over to Plaintiff and the Class Members an amount of money equal to eight-eighths (8/8ths) of the value of all CBM attributable to Plaintiff's and the Class Members' interests that has been (or will be) produced and sold by EQT, together with interest thereon and any monetary or economic benefits, advantages or profits derived therefrom by EQT.

## **PARTIES**

### **Plaintiff**

11.    Plaintiff, Robert Adair, is an adult resident citizen of Tazewell County, Virginia.

Plaintiff is the owner of land and gas interests, including CBM, in Dickenson County, Virginia.

## EQT

12.     Defendant EQT Production Company (formerly known as Equitable Production Company and as Equitable Resources Energy Company) is an out-of-state company organized under the laws of the State of Pennsylvania and has its principal office at 1710 Pennsylvania Avenue, Charleston, West Virginia 25302.

## Coal Owner Defendants

13.     Defendants Arlie J. Lambert and Ann P. Lambert, husband and wife, are adult resident citizens of Dickenson County, Virginia.

14.     Defendants Raymond Loftin and Linda Lambert Loftin, husband and wife, are adult resident citizens of Chesapeake County, Virginia.

15.     Defendants G. Worthy Pegram, Jr. and Bernice Lambert Pegram, husband and wife, are adult resident citizens of Chesapeake County, Virginia.

16.     Defendants Arthur Amos and Abbie Lambert Amos, husband and wife, are adult resident citizens of Lancaster County, Virginia.

17.     Defendants Jerry Short and Rose Lambert Short, husband and wife, are adult resident citizens of Virginia Beach County, Virginia.

18.     Defendants Harris McGirt and Joan Lambert McGirt, husband and wife, are adult resident citizens of Palm Beach County, Florida.

19.     Defendant Greg Lambert is an adult resident citizen of Washington County, Virginia.

20.     Defendants C. W. Dotson and Mary Frances L. Dotson are adult resident citizens of Washington County, Virginia.

21.     Defendant Ocie G. Sutherland is an adult resident citizen of Washington County, Virginia.

22.     Defendants Dennis Sutherland and Charlotte Sutherland, husband and wife, are adult resident citizens of Dickenson County, Virginia.

23.     Defendants Don Rainey and Linda Carol Rainey, husband and wife, are adult resident citizens of Radford County, Virginia.

24.     Defendant Lambert Land LLC is a company organized under the laws of the State of Virginia and has its principal office in Dickenson County, Virginia.

25.     The defendants identified in paragraphs 13-24, above, are those persons and entities who have been identified by EQT in its filings with the Board as coal estate owners that (allegedly) have "conflicting claims" with the "N. K. Rasnick Heirs" (including Plaintiff) in respect to the ownership of CBM produced from certain CBM Units operated by EQT. The "John Does A-Z" defendants are the additional persons and entities who have been identified by EQT in its filings with the Board as coal owners that (allegedly) have "conflicting claims" with absent Class Member gas owners in respect to the ownership of CBM produced from CBM Units operated by EQT.  The complete identity of the John Doe defendants is currently unknown by Plaintiff, but the identity of those defendants is known by EQT, and Plaintiff will name them as specific parties defendant upon Plaintiff's receipt of the necessary information from EQT.

## JURISDICTION

26.     Plaintiff, individually and on behalf of the Class, seeks the issuance of a declaratory judgment pursuant to 28 U.S.C. § 2201(a) and the recovery of damages and/or injunctive relief as a result of the matters described hereinafter.

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2) because the aggregate amount in controversy exceeds $5,000,000 exclusive of

interest and costs, and because one or more members of the Class are citizens of a State different from, *inter alia*, Defendant EQT Production Company.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question) because this action arises under the Constitution of the United States.  This Court also has supplemental jurisdiction over Plaintiff's claims under 28 U.S.C. §1367.

28.    This Court has personal jurisdiction over Defendants because, *inter alia*, Defendants conduct business in the Commonwealth of Virginia, including, *inter alia*, producing gas in the Commonwealth of Virginia, and entering into agreements for the sale of property and property rights located in the Commonwealth of Virginia.

29.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the acts and transactions complained of herein occurred in this District, and pursuant to 28 U.S.C. §1391(a)(3) because Defendants are subject to personal jurisdiction at the time this action is commenced.

## **DEFINITIONS**

30.    The following definitions apply to this Complaint:

a.    The term "including" means "including, without limitation."

b.    "Coal Owner Defendants" means the named defendants listed in paragraphs 13 - 24, above, and the "John Doe A-Z" defendants.

c.    "EQT" means EQT Production Company.

d.    "Board" means the Virginia Gas and Oil Board.

e.    "CBM" means coalbed methane gas.

f.    "CBM Unit" is a CBM drilling unit operated by EQT and established by a pooling order issued by the Board.

g.      "Subject Virginia Counties" means Buchanan, Dickenson, Lee, Russell, Scott and Wise Counties, Virginia, and all other Virginia Counties in which EQT operates (or has operated) CBM well/units.

## FACTUAL ALLEGATIONS

### Background

31.     This case concerns the ownership of CBM produced by EQT from CBM Units located in the Subject Virginia Counties.

32.     Various persons and entities, including the Coal Owner Defendants, hold the right to extract coal through coal mining operations in the Subject Virginia Counties.  The coal owners mine and produce coal -- or hold the right to mine and produce coal -- based upon their ownership of the coal and/or their leasehold rights to the coal.

33.     CBM is a natural gas that resides in coal seams.  Coal companies have historically ventilated or otherwise removed CBM from their coal mines as a safety measure, and discharged the CBM into the atmosphere.  However, during the 1970's, technological advances made the commercial production and sale of CBM feasible, and CBM wells began to be drilled.

34.     In 1990, the Virginia General Assembly enacted the Virginia Gas and Oil Act, VA. CODE ANN. §§ 45.1 - 361.1, *et seq.* (the "Gas Act").  When the Gas Act was enacted, there was uncertainty in Virginia about the legal question of whether CBM was owned by the owners of the gas estate/gas interests (e.g., landowners) or by coal estate/coal interest owners (e.g., coal companies).  The Gas Act facilitated the drilling and production of CBM, without waiting for the CBM ownership issue to be judicially decided, by making it relatively easy for a company to force-pool and drill for CBM in a given area (a "unit"). However, to protect the interests of the true CBM owners, the Gas Act required the operator of the drilled well -- who also is a "participating operator" as defined in §45.1-361.1 of the Gas Act -- to place all proceeds from

the sale of CBM (less reasonable costs of production) attributable to "conflicting" CBM ownership interests into escrow until "a final decision of a court of competent jurisdiction adjudicating the ownership of coalbed methane gas as between [the conflicting claimants]." *See* VA. CODE ANN. §45.1-361.22(4) and (5).

35.     EQT began producing and selling CBM from the Subject Virginia Counties in the 1990's.  EQT's CBM operations are extensive.  At the close of 2009, EQT operated more than 1,000 CBM wells in the Subject Virginia Counties, resulting in the production of millions of Mcf of CBM that was marketed and sold by EQT in 2009.

36.     The CBM Units operated by EQT were established by pooling orders issued by the  Board under §45.1-361.22 of the Gas Act.  Each pooling order describes a defined area of surface acreage; designates that area as a drilling unit ("CBM Unit") on which a well can be located, drilled and operated for the recovery of CBM; "pools" all of the gas estates/interests in the CBM Unit; and appoints EQT as the operator of the CBM Unit.

37.     In most (if not all) instances, a CBM Unit is comprised of two or more separately owned tracts.  Under the Gas Act and the Board's pooling orders, the CBM produced by EQT from a CBM Unit is allocated among the separate tracts on a proportionate acreage basis, *i.e.*, the portion of CBM production allocated to a tract is in the same proportion which the tract's acreage bears to the total acreage in the CBM Unit. (For example, if a CBM Unit is 100 acres and is comprised of one tract (Tract 1) containing 60 acres, another tract (Tract 2) containing 30 acres, and another tract (Tract 3) containing 10 acres, then the CBM produced from the CBM Unit's well(s) would be allocated among the tracts as follows: Tract 1 – 60%; Tract 2 – 30%; and Tract 3 – 10%.)  The CBM production allocated to a particular tract is shared among the tract's gas owners on a proportionate ownership basis.

38.     Coalbed methane gas, CBM, is defined by the Gas Act as "occluded natural gas produced from coalbeds and rock strata associated therewith." VA. CODE ANN. §45.1-361.1.   As noted above, when the Gas Act was passed there was some uncertainty in Virginia about whether CBM allocated to a CBM Unit tract was owned by (a) the persons and entities owning the gas estate/ gas interests in that tract ("gas owners"), or (b) the persons and entities owning the coal estate/ coal interests in that tract ("coal owners").  (The Virginia Supreme Court addressed and answered the question on March 5, 2004.  *Harrison-Wyatt v. Ratliff*, 593 S.E.2d 234 (Va. 2004) (title to CBM does not pass to coal owner along with the coal).)

39.     Beginning in the 1990's, when making an application to the Board for a CBM Unit to be established, EQT -- as the proposed operator -- undertook to (and was obligated under §45.1-361.22 of the Gas Act to) identify those tracts in which there were conflicting claims to the ownership of CBM and provide lists/schedules that identified the conflicting claimants/potential owners.

40.     When it submitted its CBM Unit applications and made subsequent filings as the Board-appointed CBM Unit operator, EQT consistently advised and represented to the Board that conflicting claims to the ownership of CBM existed for each of those tracts in which one person or entity owned the gas estate/gas interests ("gas owner") and a different person or entity owned the coal estate/coal interests ("coal owner").  The conflicting claim allegedly arose from the question of whether the CBM allocable to that tract was owned by the gas owner(s) or by the coal owner(s).

41.     EQT provided the Board with lists/schedules that identified the "conflicting claimants," including the name of each gas owner and the name of each coal owner. The pooling

orders issued by the Board for EQT-operated CBM Units consistently adopted (apparently "rubber-stamped") EQT's assertions of "conflicting claims" of CBM ownership.

42.     EQT undertook, as the operator of the CBM Units, to produce CBM from the CBM Units; and EQT undertook, as the operator and/or as a participating working interest owner, to take possession of and sell the CBM it produced from the CBM Units.  The CBM sales proceeds attributable to "conflicting interests," including all proceeds attributable to Plaintiff's and the Class Members' gas interests, were (or were supposed to have been, but have not been) deposited by EQT into a Board-established escrow account per the provisions of VA. CODE ANN. §45.1-361.22, which provides that "[t]he coalbed methane gas well operator shall deposit into the escrow account one-eighth of all proceeds attributable to the conflicting interests plus all proceeds in excess of ongoing operational expenses as provided for under §45.1-361.21 and the order of the Board attributable to a participating or nonparticipating operator."

43.     To release the escrowed monies, §45.1-361.22(5) of the Gas Act provides that "[t]he Board shall order payment of principal and accrued interest, less escrow account fees, from the escrow account to conflicting claimants only after (i) a final decision of a court of competent jurisdiction adjudicating the ownership of coalbed methane gas as between them or (ii) an agreement among all claimants owning conflicting estates in the tract in question or any undivided interest therein."

### Determination of Ownership

44.     Plaintiff and the Class Members are the persons and entities who have been identified by EQT in its CBM Unit applications and other Board filings as the owners of the gas estates/gas interests in a CBM Unit tract ("gas owners") but whose ownership of the CBM allocated to that tract has been further identified by EQT as being in conflict with the persons

and entities who own the coal estates/coal interests in the tract ("coal owners").  The Coal Owner

Defendants are the persons and entities who have been identified by EQT in its CBM Unit

applications and other Board filings as the owners of the coal estates/interests in the relevant

CBM Unit tracts ("coal owners"), but whose coal ownership ostensibly -- according to EQT --

gives them an ownership claim to the CBM in those tracts which caused a conflict between them

and Plaintiff and the Class Members, who own the gas estates/interests in the tracts. The CBM

production proceeds attributable to Plaintiff's and the Class Members' gas interests that are --

according to EQT -- in conflict with Defendants' coal interests, have never been released from

escrow or otherwise paid over to Plaintiff and the Class Members.

45.     Through this action, Plaintiff requests, on behalf of himself and the Class, that the

Court enter a judgment declaring, as between the "conflicting claimants" identified by EQT, that

as a matter of law the CBM allocated to the subject CBM Unit tracts is owned by Plaintiff and

the Class Members (the gas owners) and is not owned by the Coal Owner Defendants (the coal

owners).  Such a determination is a straightforward legal issue, given the Virginia Supreme

Court's decision in *Harrison-Wyatt, LLC v. Ratliff*, 593 S.E.2d 234, 238, 267 Va. 549, 556

(2004) (coalbed methane gas "is a distinct mineral estate" from coal, and landowners (gas

owners) retain the rights to CBM when they convey or lease coal rights), and the very recent

addition of §45.1-361.21:1 to the Gas Act which provides that: "A conveyance, reservation, or

exception of coal shall not be deemed to include coalbed methane gas."

46.     EQT has, upon information and belief, entered into leases with most (if not all) of

the Coal Owner Defendants and asserted that, as between EQT and the Coal Owner Defendants,

EQT owns the right, as the working interest owner/lessee, to receive in kind and sell the CBM that

is allocated to the CBM Unit tracts covered by its coal owner leases (subject to EQT's royalty

payment obligations to its lessors, the Coal Owner Defendants). EQT's asserted leasehold rights are non-existent, however, because the Coal Owner Defendants had no CBM ownership or production rights to lease to EQT.  EQT's assertions of any such leasehold rights is baseless, contrary to governing law, without justification, and in conflict with the rights and interests of Plaintiff and the Class Members, who are the true CBM owners. Plaintiff, therefore, also requests, on behalf of himself and the Class Members, that the Court enter a judgment declaring that EQT's CBM leases with the Coal Owner Defendants are void *ab initio* and of no force and effect as to those CBM Unit tracts that include Plaintiff's and Class Members' gas interests.

47.    The CBM Unit proceedings instituted by EQT resulted in the entry of Board orders providing that Plaintiff and the Class Members (the true owners of the CBM) were "deemed" to have leased their CBM interests in the CBM Units to EQT.  *See* VA. CODE ANN. §45.1-361.22(6) ("Any person who does not make an election under the pooling order shall be deemed, subject to a final legal determination of ownership, to have leased his gas or oil interest to the coalbed methane gas operator as the pooling order may provide.")

48.    Such "deemed leases"  were conditionally imposed, in that those "leases" are, in accordance with VA. CODE ANN. §45.1-361.22(6), "subject to a final legal determination of ownership."

49.    The Board does not (as EQT and the Board agree) have the authority to make "a final legal determination of ownership."

50.    Plaintiff respectfully asks this Court to apply *Ratliff* and §45.1-361.21:1 and make an ownership determination in favor of Plaintiff and the Class Members.

51.    Such a "final legal determination of ownership" of the CBM in favor of Plaintiff and the Class Members will nullify the deemed leases conditionally imposed upon them, voiding

the deemed leases *ab initio*, and Plaintiff requests the entry of a declaratory judgment to that effect.

52.     Plaintiff further requests that this Court enter a judgment declaring that Plaintiff and the Class Members are unleased mineral owners and that EQT must account to Plaintiff and the Class Members as such.  Accordingly, Plaintiff and the Class Members are, as to the past production of CBM by EQT, entitled to receive from the Board's escrow account and/or from EQT directly, all (8/8ths) proceeds attributable to their interests (net of proper operating costs) and the Court should direct EQT and/or the Coal Owner Defendants to instruct and otherwise authorize the Board to release such proceeds from escrow, plus all interest accrued (or which could or should have accrued) thereon, and pay such monies over to Plaintiff and the Class Members.   In addition, Plaintiff and the Class Members, as unleased mineral owners, are entitled, as to future production, to elect to either (i) take "in-kind" and sell all (8/8ths) of the CBM that is attributable to their unleased CBM interests, or (ii) have EQT, as the CBM Unit operator, to (properly) sell all (8/8ths) of the CBM that is attributable to their unleased CBM interests and remit the proceeds for same to Plaintiff and the Class Members on a monthly basis (with arrangements to be made, in either event, for Plaintiff and the Class Members to bear their proportionate share of actual, direct and reasonable costs as unleased mineral owners).

## EQT's Escrow Account Obligations

53.     With regard to EQT's escrow payment obligations, EQT has asserted that it is only obligated to deposit "deemed lease" royalty payments ("1/8th net proceeds") into the escrow account.

54.     As a result, 7/8ths of the CBM sales proceeds attributable to Plaintiff's and the Class Members' "conflicting interests" have been retained by EQT for its own use and benefit, with no accounting or payment for same having been made to Plaintiff and the Class Members.

55.     EQT was obligated, however, as a "participating owner" under the Gas Act holding leasehold rights attributable to "conflicting interests," to deposit such 7/8ths proceeds (net of operating costs) into the escrow account. *See* Va. Code Ann. §45.1-361.22(4).

56.     Under §45.1-361.22(6) of the Gas Act and the pooling orders issued by the Board, Plaintiff and the Class Members were "deemed" (subject to a final legal determination of ownership) to have leased their gas interests to EQT. EQT thereupon purportedly became a "gas owner" as that phrase is defined in the Gas Act.  *See* Section 45.1-361.1 ("gas or oil owner" defined as "any person who owns, leases, has an interest in, or who has the right to explore for, drill, or operate a gas or oil well as principal or as lessee." (emphasis added)).

57.     As to the leasehold interests EQT purportedly obtained via its deemed leases, EQT opted to become a "participating operator," which is a term defined by the Gas Act to mean "a gas or oil owner who elects to bear a share of the risks and costs of drilling, completing, equipping, operating, plugging and abandoning a well on a drilling unit and to receive a share of production from the well equal to the proportion which the acreage he owns or holds under lease bears to the total acreage of the drilling unit." Va. Code Ann. §45.1-361.1 (definition of "participating operator").

58.     EQT  took possession of and sold the CBM Unit production attributable to the leasehold interests it purportedly obtained from the Class Members under its deemed leases.

59.      EQT  was supposed to pay all of its sales proceeds, net of operating expenses, into the Board's escrow account in accordance with §45.1-361.22(4) of the Gas Act, which

provides: "The coalbed methane gas well operator shall deposit into the escrow account one-eighth of all proceeds attributable to the conflicting interests **plus** all proceeds in excess of ongoing operational expenses as provided for under §45.1-361.21 and the order of the Board attributable to a <u>participating</u> or non-participating <u>operator</u>." (Emphasis added.) Because EQT's leasehold interests were attributable to "conflicting interests" (i.e., EQT derived its interests from gas owners whose claims of ownership were -- according to EQT -- in conflict with the CBM ownership claims of coal owners), EQT was not free to retain any proceeds for its own use and benefit, but was instead required by the Gas Act to place <u>all</u> such proceeds (net of operating expenses) into escrow so that those proceeds would be available to the true owners (here, the Class Members) upon a final legal determination of ownership in their favor.

60. As written, the Gas Act's "deemed lease" and escrow provisions work together to (a) clarify the legal authority of the operator to produce and sell the CBM attributable to "conflicting claims" until the CBM ownership claims could be resolved, and (b) preserve and protect for the true owners all of the proceeds attributable to the conflicting interests.

61. To the extent EQT has deposited into escrow the proper amount of proceeds attributable to Plaintiff's and the Class Members' interests (8/8ths proceeds minus operating costs), Plaintiff and the Class Members are entitled to receive a judgment from the Court directing EQT to instruct and otherwise authorize the Board to release such escrowed proceeds to Plaintiff and the Class Members, including all escrow account interest accrued thereon.

62. To the extent, however, that EQT failed to properly pay such proceeds into escrow (which Plaintiff alleges is likely), EQT should be required, via the entry of a judgment, to pay to Plaintiff and the Class Members an amount of money equal to the total amount of proceeds EQT should have deposited, but failed to deposit, plus prejudgment and equitable

interest thereon, and plus the value of any monetary or other economic advantages, profits, and benefits, including attendant tax credits, that EQT realized through its receipt, retention and use of said proceeds.

63.     The one-eighth payments that EQT deposited into escrow for the deemed leases were themselves calculated improperly.  The full extent of EQT's acts and omissions in regard to its payments (or non-payments) of "deemed lease" royalties is not currently known, and can only be determined adequately through an accounting and investigation of EQT's books, records, and practices, including, without limitation, disclosure of detailed information relating to the handling and marketing of CBM produced by EQT and all other matters relating to EQT's calculation and payment (or nonpayment) of "deemed lease" royalty payments into escrow.

64.     For example, Plaintiff alleges upon information and belief that there are certain instances in which EQT has wholly failed to deposit Plaintiff's and the Class Members' "deemed lease" royalties  into escrow and has, instead, retained all (8/8ths) of the proceeds.

65.     Similarly, Plaintiff alleges upon information and belief that there are certain instances where the "deemed lease" royalties paid by EQT for Plaintiff and other Class Members into escrow were calculated improperly and were insufficient.  For example, in marketing the CBM it produced, EQT was obligated, by virtue of its undertakings and/or as the CBM Unit operator, to act as a reasonably prudent operator and to market and sell the CBM at the highest price obtainable.  However, in calculating and depositing its "deemed lease" royalty payments into escrow, EQT has, upon information and belief, improperly used gas prices that were less than the highest price obtainable, including prices from the sale of gas by EQT to affiliates on a non-arm's-length basis.

66.     Plaintiff and the Class Members demand and are entitled to receive a full and accurate disclosure and an accounting of all such matters from which the full extent of EQT's wrongful acts and omissions and Plaintiff's and the Class Members' resulting damages may be revealed.

67.     Plaintiff and the Class Members are entitled to recover from EQT all amounts that are shown to be owed by EQT as the result of such accounting, including prejudgment and equitable interest thereon at the maximum lawful rate.

68.     As set forth above, Plaintiff and the Class Members are entitled to receive all (8/8ths) of the proceeds attributable to their interests and produced by EQT in the past (through either the release of proceeds from escrow or from EQT, directly, if EQT failed to deposit the proceeds into escrow); and  are entitled, as to future production, to either take in kind and sell all (8/8ths) of the CBM that is attributable to their unleased CBM interests or have EQT, as the CBM Unit operator, to (properly) sell the CBM for their account.

69.     EQT may assert that, regardless of a final legal determination of CBM ownership in favor of Plaintiff and the Class Members, Plaintiff and the Class Members are bound by "deemed leases," and that their only remedies are to receive "deemed lease" royalties deposited into escrow for past production, and to receive "deemed lease" royalty payments directly for future production. Such a result would be contrary to the proper interpretation of the Gas Act, as written, and would, if applied, cause the "deemed lease" provisions of the Gas Act to be unconstitutional, as applied, on the grounds set forth below.

**The Unconstitutional Deemed Leases**

70.     If the Court applies the plain language of the Gas Act as Plaintiff suggests above, then the Gas Act is being applied constitutionally, and the Court need not reach the unconstitutionality allegations outlined below.

71.     However, if the Court were to agree with EQT's interpretation of the Gas Act, including, *inter alia*, the allowance of permanent deemed leases in forced pooling orders in favor of an operator who has no true gas ownership or gas lease rights in the proposed unit, then the deemed lease provisions of the Gas Act (§45.1-361.22(6)) constitute a taking of Plaintiff's property rights for private purposes under State authority, in violation of the Fifth Amendment to the United States Constitution, and in violation of Article I, Section 11, of the Virginia Constitution; or, alternatively, constitute a taking of Plaintiff's property rights under State authority without adequate or just compensation, in violation of the Fifth Amendment to the United States Constitution and in violation of Article I, Section 11 of the Virginia Constitution.

72.     Plaintiff does not challenge the authority of the Commonwealth of Virginia to enact statutes containing reasonable and necessary provisions for the compulsory pooling of interests in a single pool, including a CBM Unit. Such a statute must, however, protect the "correlative rights" of each gas owner having an interest in the unit, which rights have been defined by the Gas Act to mean "the right of each gas or oil owner having an interest in a single pool to have a fair and reasonable opportunity to obtain and produce his just and equitable share of production of the gas or oil in such pool or its equivalent without being required to drill unnecessary wells or incur other unnecessary expenses to recover or receive the gas or oil or its equivalent." VA. CODE ANN. §45.1-361.1 (definition of "correlative rights").

73.     Under the Gas Act and CBM Unit pooling orders issued by the Board, an unleased mineral interest owner whose interests are force-pooled may elect either to (a) sell or lease his gas ownership to a participating operator, (b) enter into a voluntary agreement to share in the operation of the well at a rate of payment mutually agreed to by the gas owner and the gas operator authorized to drill the well, or (c) share in the operation of the well as a non-participating operator on a carried basis after the proceeds allocable to his share equal 200% of the share of such costs allocable to his interests. *See* VA. CODE ANN. §45.1-361.21(c)(7).

74.     Section 45.1-361.22 of the Gas Act contains additional provisions applying specifically to the pooling of interests for CBM Units and provides: "Any person who does not make an election under the pooling order shall be deemed, subject to a final legal determination of ownership, to have leased his gas or oil interests to the coalbed methane gas well operator as the pooling order may provide." VA. CODE ANN. §45.1-361.22(6).

75.     The pooling orders entered by the Board for CBM Units operated by EQT provide that Plaintiff and the Class Members were subject to a "deemed lease" of their CBM interests to EQT which provided for "royalties" on a "1/8th net proceeds" basis, with net proceeds being comprised of actual proceeds received by EQT from the sale of the CBM less costs incurred downstream of the wellhead, including, but not limited to, gathering, compression, treating, transportation and marketing costs. (Such "royalties" were not paid to Plaintiff and the Class Members but were instead deposited (or should have been deposited) into an escrow account and are being held by the Board pending judicial resolution of the alleged "conflicting claims" of CBM ownership.)

76.     As interpreted and sought to be applied by EQT, the Gas Act's "deemed lease" provisions in §45.1-361.22(6) and corresponding provisions in the Board's pooling orders,

unconstitutionally deprive Plaintiff and the Class Members, unleased mineral owners, of their property rights and interests.

77.     Specifically, where an unleased mineral owner does not choose to sell or lease its rights and interests or to participate on some basis in the operations, the "deemed lease" provisions are automatically invoked to effect a transfer of the property rights and interests of the unleased mineral owners (Plaintiff and the Class Members) to another private party (EQT).

78.     The unleased mineral owner is, thus, divested of its CBM ownership interests, which are transferred to the operator, and is left with only a 1/8th net proceeds royalty interest.

79.     One of the attributes of mineral ownership is the "executive right," which is the right of a gas owner to lease his interests to a third party under lease bonus, royalty rate, and other terms and conditions acceptable to the gas owner, in his sole discretion. The Board's establishment of a de facto standard 1/8th net proceeds royalty rate and meager lease bonuses of $1.00 per acre and $5.00 per acre, has eliminated the ability of unleased mineral owners in Virginia, including Plaintiff and the Class Members, to negotiate a lease with the CBM Unit operator or third parties on terms acceptable to the unleased mineral owners.

80.     Instead, the statutory "options" available under Virginia's law present Plaintiff and the Class Members with the proverbial Hobson's Choice.  If they attempt to procure a negotiated lease at all, operators in Virginia, including EQT, offer unleased mineral owners a "take it or leave it" proposition, offering no more than the standard "deemed lease" royalty rate of "1/8th net proceeds."

81.     If the mineral owner declines, EQT simply employs the "deemed lease" provision of Virginia's statutory scheme to procure the mineral owner's rights and interests for the 1/8th net proceeds royalty rate and $1.00/$5.00 per acre bonus.

82.     Moreover, when presenting an unleased mineral owner with his or her (so-called) "election options," EQT and other CBM Unit operators have routinely engaged in practices intended and designed to induce or force unleased mineral owners into "deemed leases" and procure "deemed leases" for the operators improperly.  For example, EQT has failed to undertake due diligence to locate unleased mineral owners and give direct notice to unleased mineral owners, including Plaintiff, otherwise failed to give adequate notice to unleased mineral owners, including Plaintiff, and routinely failed to disclose pertinent data and information, overstated well drilling, completion and operating costs, and underestimated anticipated recoverable CBM reserves, including to Plaintiff, so that unleased mineral owners, including Plaintiff and the Class Members (who are usually unsophisticated and inexperienced landowners lacking sufficient knowledge or information to understand the highly technical engineering, property administration, and other complex aspects of gas well operations and the complex cost and revenue accounting practices relating thereto) have no meaningful knowledge or understanding of  the proposed operations or of the consequences of an election or failure to elect.

83.     Additionally, even if an unleased mineral owner were inclined to participate, the statutory scheme is designed to enable and empower EQT and other operators to discourage unleased mineral owners from so doing, because the operator can claim unilaterally and improperly (as EQT has done here) that unleased mineral owners have "conflicting claims" of CBM ownership with coal owners and thereby cause all of the proceeds attributable to those so-called "conflicting interests" to be held by the Board in escrow pending a final legal determination of ownership.

84.     The "deemed lease" provisions of the Gas Act -- as EQT asserts they must be applied -- do not relate to nor advance any legitimate State interest or the purposes, goals and objectives of the pooling laws.

85.     To be constitutional, a compulsory or forced pooling statute should only -- and need only -- "pool"  the unleased mineral owners' rights and interests in the Unit and provide that if an unleased mineral owner does not elect to participate, then he will be treated as a non-participating ("carried") working interest owner.

86.     The "pooled" unleased mineral owner would thereby retain all (8/8ths) of his or her interests share in the production of CBM well as a non-operating working interest owner, and bear his or her proportionate share of operating costs on a non-participating ("carried") basis.

87.     The Gas Act's  "deemed lease" provisions, however, go too far; it is not necessary for the pooling of an unleased mineral owners' interests, is not consistent with the constitutionally permissible purposes of the pooling law, and effects a taking of private property from the unleased mineral owner  and the transfer of that private property to another private person, for the benefit of that other private person (the operator), in violation of the United States and Virginia Constitutions.

88.     In addition to being an unconstitutional taking for private purposes (which is unconstitutional regardless of the amount of compensation paid for the taking), the deemed lease provisions are unconstitutional because they are premised on compensation that is inadequate and unjust.

89.     EQT's CBM wells are extremely low-risk (no-risk) operations, given that the wells are drilled at relatively shallow depths into coal seams that are known to contain substantial quantities of commercially recoverable CBM. In such circumstances, the deemed

lease royalty terms (1/8th net proceeds royalty and paltry cash bonuses of $1.00 per acre and $5.00 per acre) are materially and substantially less than the royalty terms and provisions that could be obtained by unleased mineral owners through the negotiation of a gas lease in a free, open, and competitive market, and do not represent fair market value for the Plaintiff's and the Class Members' property interests.

90.     Accordingly, the "deemed leases" constitute a taking of Plaintiff's and Class Members' property rights without adequate and just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and in violation of Article I, Section 11 of the Virginia Constitution.

91.     If they have the effect asserted by EQT, the "deemed leases" are unconstitutional, and they are, therefore, unenforceable and void *ab initio*. Accordingly, Plaintiff and the Class Members are entitled, as unleased mineral owners, to receive from the Board's escrow account and/or from EQT directly an amount of money equal to eight-eighths (8/8ths) of the value of all the CBM attributable to Plaintiff's and the Class Members' unleased mineral interests that has been produced and sold by EQT in the past; and are entitled to be treated as unleased mineral owners as to any future production.

92.     EQT requested that the Board implement the constitutionally deficient "deemed leases," and EQT thereby engaged in willful, wanton, outrageous, bad faith, anti-competitive, and otherwise improper conduct.  EQT should, therefore, be required, as to its past production, to make such 8/8ths payments to Plaintiff and the Class Members on a gross proceeds basis, without any deductions for a proportionate share of drilling, completion, or operating costs.

## PUNITIVE DAMAGES

93.     The acts and omissions of EQT as set forth hereinabove were willful and wanton and in utter disregard of the rights of Plaintiff and the Class Members, or were done with reckless disregard for their rights, thus entitling Plaintiff and the Class Members to punitive damages against EQT in an amount to be determined by the jury.

## SPECIAL MASTER

94.     Plaintiff requests that the Court consider the appointment of a master under Rule 53, FED. R. CIV. P., to assist the Court in the resolution of the accounting issues due to be resolved through this action, with all such costs for same, including the master's compensation, to be paid by EQT.

## CLASS ACTION ALLEGATIONS

95.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the Class, defined as follows:

> Each person and entity who has been identified by EQT Production Company as an "unleased" owner of the gas estate or gas interests in a tract included in a coalbed methane gas unit operated by EQT Production Company in any of the Subject Virginia Counties, but whose ownership of the coalbed methane gas attributable to that tract has been further identified by EQT Production Company as being in conflict with a person(s) or entity(ies) owning the coal estate or coal interests in the tract, according to filings made by EQT Production Company with the Virginia Gas and Oil Board and/or according to orders entered by the Virginia Gas and Oil Board pursuant to EQT Production Company's filings. The Class excludes (a) the Defendants, and (b) any person who serves as a judge in this civil action and his/her spouse.

96.     Plaintiff reserves the right to redefine the Class and/or establish subclasses as may be appropriate.

97.     The members of the Class are so numerous that joinder of all members is impractical.  Disposition of the claims in this action will provide substantial benefits to both the

parties and the Court.

98.     Although the precise number and identity of the Class Members can be ascertained from the books and records of Defendants, Plaintiff alleges, upon information and belief, that the Class exceeds 100 members.

99.     There are questions of law and/or fact common to the Class that predominate over any questions that affect only individual Class Members.  These questions include, but are not limited to, the following:

a.     Whether the Gas Act makes the existence of deemed leases created by CBM ownership conflicts under §45.1-361.22(6) subject to final legal determinations of CBM ownership;

b.     Whether as a matter of law Plaintiff and the Class Members own the CBM that is attributable to the CBM Unit tracts in which they own gas estates/gas interests;

c.     Whether as a matter of law a conveyance, reservation, or exception of coal does not include CBM;

d.     Whether Defendants have committed an actionable trespass upon Plaintiff's and the Class Members' lands and/or gas interests;

e.     Whether EQT has converted Plaintiff's and the Class Members' CBM and/or revenues attributable thereto;

f.     Whether EQT has failed to account and/or properly account to Plaintiff and the Class Members for CBM and/or revenues attributable thereto;

g.     Whether EQT should prospectively account to Plaintiff and the Class Members as unleased mineral owners;

        h.      Whether EQT's accounting methodology for the production of CBM from the Subject Virginia Counties, including its calculation of production proceeds attributable thereto and EQT's payment, underpayment and/or non-payment of proceeds into escrow, was the same for all Class Members;

        i.      Whether EQT used the same methodology and underlying records to calculate all Class Members' escrow account payments;

        j.      Whether EQT used for all Class Members the same gas prices (per MCF and/or per MMBtu) to calculate their escrow account payments on CBM produced by EQT, and the transactions upon which those gas prices were based;

        k.      Whether the gas prices used by EQT to make royalty payments attributable to Plaintiff's and the Class Members' interests into escrow were less than the best gas prices obtainable for such CBM;

        l.      Whether the "deemed lease" provisions of the Gas Act and/or the "deemed lease" provisions of the Board's pooling orders -- as interpreted and applied by EQT -- are an unconstitutional taking for private purposes;

        m.      Whether the "deemed lease" royalty provisions ("1/8th net proceeds" royalty rate and $1.00 per acre and $5.00 per acre "cash bonuses"), as sought by EQT to be imposed on Plaintiff and the Class Members, are unconstitutional;

        n.      Whether EQT has violated its duty to properly account to Plaintiff and the Class Members on CBM produced in the Subject Virginia Counties as a result of the acts and omissions described herein; and

        o.      Whether punitive damages can and should be imposed on EQT by virtue of EQT's wrongful acts and omissions.

100.     EQT has acted on grounds that apply generally to Plaintiff and all Class Members, so that declaratory and injunctive relief is necessary and appropriate for the Class as a whole, consistent with Rule 23(b)(2) of the Federal Rules of Civil Procedure.

101.     The critical remedy that Plaintiff seeks -- a final legal determination of CBM ownership -- is primarily declaratory and injunctive. The monetary relief that Plaintiff seeks is secondary to, and flows from, the declaratory/injunctive request.

102.     The common pattern of conduct by Defendants (along with the common theories for redressing the misconduct) support the maintenance of this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

103.     Plaintiff and the Class Members share a well-defined community of interest; many common questions of law and fact are common to Plaintiff and all Class Members.

104.     Plaintiff's claims are typical of the claims of the Class, and Plaintiff has the same interests as the other members of the Class.

105.     Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

106.     Plaintiff is committed to prosecuting this action and has retained experienced and competent counsel.  Plaintiff's counsel are experienced in class actions, including actions that involve breaches of oil and gas leases, and underpayments of gas royalties.  Neither Plaintiff nor Plaintiff's counsel have any interests that might cause them not to vigorously pursue this action.

107.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, many members of the Class will find the litigation costs regarding their claims so prohibitive that they effectively would be unable to seek any redress at law.  Because of the size of the individual Class Members' claims, many could not

afford to seek legal redress or the relief requested for the wrongs set forth herein.  Absent a class

action, Defendants  will continue the improper and wrongful conduct herein described, the Class

Members will continue to be damaged by Defendants' wrongful conduct, and Defendants'

violations of the law will continue without remedy.

## COUNT I

## DECLARATORY JUDGMENT

108.    Plaintiff restates and incorporates herein by reference all of the allegations

contained in the above numbered paragraphs.

109.    Plaintiff requests that the Court issue a judgment pursuant to 28 U.S.C. §2201,

and declare that:

      a.      Plaintiff and the Class Members --not Defendants --are the owners of the CBM that is attributable/allocated to those CBM Unit tracts as to which EQT has asserted there are conflicting claims of CBM ownership as between Plaintiff and Class Members (as gas owners), on the one hand, and the Coal Owner Defendants (as coal owners), on the other hand;

      b.      The CBM leases that EQT has entered, as lessee, with Coal Owner Defendants, as lessors, are void and of no force and effect as to the CBM Unit tracts in which Plaintiff's and the Class Members' gas interests are included, because as a matter of law the Coal Owner Defendants do not own the CBM, and therefore they cannot lease it to EQT;

      c.      EQT, as the CBM Unit operator, must account to Plaintiff and the Class Members as unleased mineral owners, e.g., on an eight-eighths (8/8ths) basis, net of operational expenses, and do so as to both past production and future production;

      d.      All proceeds attributable to Plaintiff's and the Class Members' CBM interests must be released from escrow to Plaintiff and the Class Members;

      e.      EQT must account for the methodology it used to calculate the escrowed proceeds, must prove that it sold the CBM at

the highest price obtainable and otherwise calculated the proceeds (8/8ths, net of operational expenses) properly, and must pay over to Plaintiff and the Class Members any proceeds EQT calculated improperly or failed to deposit into escrow;

f.    If the "deemed lease" provisions of the Gas Act are not interpreted as written but are instead interpreted to confine and limit Plaintiff's and the Class Members' rights and remedies to the recovery of past and/or future proceeds based on only a 1/8th net proceeds "deemed lease" royalty interest, then those statutory provisions so interpreted and applied must be held to be an unconstitutional taking and transfer of Plaintiff's and the Class Members' valuable CBM rights, interests and properties to EQT for private purposes, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 11 of the Virginia Constitution; or, alternatively, the  deemed lease royalty provisions ("1/8th net proceeds" royalty rate and paltry lease bonuses of $1.00 and $5.00 per acre) established by §45.1-361.22(6) of the Gas Act and/or by the provisions of pooling orders issued by the Board, constitute an unconstitutional taking without adequate or just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and in violation of Article I, Section 11 of the Virginia Constitution; and -- in either event -- the deemed leases EQT seeks to impose must be declared void and unenforceable and EQT must account to Plaintiff and the Class Members as unleased mineral owners and must disgorge and pay over to Plaintiff and the Class Members an amount of money equal to eight-eighths (8/8ths) of the value of all the CBM attributable to Plaintiff's and the Class Members' interests that has been (or will be) produced and sold by EQT, together with interest thereon and any monetary or economic benefits, advantages or profits derived therefrom by EQT.

## COUNT II

## TRESPASS

110.    Plaintiff restates and incorporates herein by reference all of the allegations contained in the above-numbered paragraphs.

111.    Trespass is the unauthorized use of or entry onto another's property.  EQT, as the Board-appointed operator of the CBM Units, had the lawful authority to produce the CBM that was attributable to Plaintiff's and the Class Members' interests.  However, once the CBM was produced, EQT was obligated to deliver the CBM to the rightful owners.

112.    EQT and/or the Coal Owner Defendants exercised wrongful dominion and control over the CBM that was attributable to Plaintiff's and the Class Members' interests and deprived Plaintiff and the Class Members of such CBM and/or production revenues by claiming that the Coal Owner Defendants own the CBM as a result of their coal ownership interests and/or that EQT had the right to receive and sell the CBM as the Coal Owner Defendants' lessee.

113.    EQT, acting in concert with the Coal Owner Defendants, took possession of and sold CBM that was owned by and attributable to the interests of Plaintiff and the Class Members, and did so without receiving lawful authorization or permission from Plaintiff and the Class Members.

114.    Such actions by EQT and the Coal Owner Defendants constitute actionable trespass upon Plaintiff's and the Class Members' lands and/or gas ownership interests.  Such actions constitute willful, bad faith trespass as to, *inter alia*, such actions taken by Defendants after March 5, 2004, when the Virginia Supreme Court issued its decision in *Ratliff*.

115.    Plaintiff and the Class Members have been damaged as a proximate result thereof and are entitled to recover their actual damages from Defendants, statutory, equitable or other prejudgment interest at the maximum lawful rate, punitive damages, and any and all other relief deemed appropriate by the Court.

## COUNT III

## CONVERSION

116.    Plaintiff restates and incorporates herein by reference all of the allegations contained in the above-numbered paragraphs.

117.    EQT, as the Board-appointed operator of the CBM Units, had the lawful authority to produce the CBM that was attributable to Plaintiff's and the Class Members' interests. However, once the CBM was produced, EQT was obligated to either deliver all of the CBM in kind to Plaintiff and the Class Members or properly sell the CBM on Plaintiff's and the Class Members' behalf and remit the proceeds for same to Plaintiff and the Class Members. EQT failed to do this, and instead took wrongful possession of, sold and used the CBM for its own account, and received and retained the resulting sales proceeds for its own account, use, and benefit.

118.    EQT's conduct constitutes an unlawful conversion of the CBM production that is attributable to the Plaintiff's and Class Members' ownership interests and/or sales proceeds derived from the sale of such CBM production. Plaintiff and the Class Members are entitled to receive from EQT an amount of money equal to the gross revenues received by EQT from the sale of Plaintiff's and Class Members' CBM production, or the fair market value of such CBM production, whichever is greater.

119.    Plaintiff and the Class Members have been damaged as a proximate result thereof and are entitled to recover their actual damages from EQT, statutory, equitable or other prejudgment interest at the maximum lawful rate, punitive damages, and any and all other relief deemed appropriate by the Court.

## COUNT IV

## NEGLIGENCE: VOLUNTARY UNDERTAKING

120.    Plaintiff restates and incorporates herein by reference all of the allegations contained in the above-numbered paragraphs.

121.    EQT voluntarily undertook to submit applications to the Board for the creation of CBM Units and thereby also voluntarily undertook the tasks of identifying the persons and entities owning an interest in the proposed units and identifying any conflicting CBM ownership claims therein.  EQT recognized, or should have recognized, that the proper identification of owners and ownership interests was necessary for the protection of those persons and entities actually owning interests in the CBM that was going to be produced from the CBM Unit.  As a matter of law, EQT's undertaking imposed upon EQT a duty to exercise reasonable care in the discharge of its undertaking.

122.    On March 5, 2004, the Virginia Supreme Court issued its ruling in *Ratliff* and thereby established that, as between the owner of the gas estate/gas interests, on the one hand, and the owner of the coal estate/coal interests, on the other hand, CBM is owned by the owner of the gas estate/gas interests.  After March 5, 2004, and notwithstanding the Supreme Court's decision in *Ratliff*, EQT continued to make applications to the Board for the establishment of CBM Units and in connection therewith failed to exercise reasonable care with regard to its identification of the persons and entities owning interests in the CBM.

123.    Among other things, EQT improperly ignored the holding of *Ratliff*; improperly asserted that conflicting CBM ownership claims existed between gas owners and coal owners; improperly procured the Board's entry of pooling orders which adopted (false) assertions of conflicting CBM ownership claims as between gas owners and coal owners; and improperly caused CBM sales proceeds owed to the true CBM owners -- the gas owners -- to be subjected to

escrow, thereby depriving Plaintiff and the Class Members of the CBM production and/or production proceeds to which they were entitled.  Further, after the Virginia Supreme Court's March 5, 2004, opinion in *Ratliff*, EQT, as the operator of CBM Units established prior to March 5, 2004, should have filed, but failed to file, supplemental and corrected ownership schedules with the Board in regard to those CBM Units that had been established prior to March 5, 2004. EQT should have withdrawn its prior ownership schedules in which gas owners and coal owners had been categorized incorrectly as "conflicting claimants," and should have submitted amended schedules reflecting, consistent with *Ratliff*, that the gas owners --not the coal owners -- were the true CBM owners. EQT could and should have thereby caused escrowed proceeds attributable to past production to be released to the gas owners, including Plaintiff and the Class Members, and/or caused proceeds attributable to future production to be paid to the gas owners, including Plaintiff and the Class Members, instead of being placed into escrow.

124.    Such acts and omissions constitute a failure by EQT to exercise reasonable care in the performance of its undertaking, and constitute actionable negligence. Further, EQT's acts and omissions in this regard constitute gross negligence and willful, wanton misconduct.

125.    Plaintiff and the Class Members have been damaged as a proximate result thereof and are entitled to recover their actual damages from EQT, statutory, equitable, or other prejudgment interest at the maximum lawful rate, punitive damages, and any and all other relief deemed appropriate by the Court.

## COUNT V

## NEGLIGENCE: DUTIES AS UNIT OPERATOR

126.    Plaintiff restates and incorporates herein by reference all of the allegations contained in the above-numbered paragraphs.

127.    EQT owed Plaintiff and the Class Members certain obligations resulting from duties that are implied and imposed by law on the operators of force-pooled units, including the duty to act as a reasonably prudent operator and the duty to market.

128.    The above-described conduct by EQT constitutes violations and breaches of EQT's duty to act as a reasonably prudent operator and EQT's duty to market.

129.    Plaintiff and the Class Members have been damaged as a proximate result thereof and are entitled to recover their actual damages from EQT, statutory, equitable, or other prejudgment interest at the maximum lawful rate, punitive damages, and any and all other relief deemed appropriate by the Court.

**COUNT VI**

**BREACH OF FIDUCIARY DUTIES**

130.    Plaintiff restates and incorporates herein by reference all of the allegations contained in the above-numbered paragraphs.

131.    Fiduciary duties and responsibilities were owed by EQT to Plaintiff and the Class Members by virtue of (a) EQT's status as the Board-appointed operator of CBM Units created through compulsory/forced pooling; (b) EQT's control over and handling, as unit operator, of CBM production and sales proceeds for the benefit of persons owning interests in the CBM Units operated by EQT, including Plaintiff and the Class Members; and/or (c) EQT's undertakings to act as agent and/or joint venturer for, or for the benefit of, other interest owners in the CBM Units operated by EQT, including Plaintiff and the Class Members, in regard to the production, marketing and sale of CBM produced from the CBM Units and in regard to the accounting and revenue distribution functions related thereto.  By virtue of such fiduciary duties and responsibilities, EQT had an affirmative duty to correctly identify the interest owners in the CBM Unit; calculate and pay the true and correct amount of monies due to the interest owners,

including Plaintiff and the Class Members; account for all of the CBM produced and sold by

EQT; and fully and accurately report and disclose all material information relating to EQT's

calculation of its payments.

132.     EQT's acts and omissions as above-described constitute violations and breaches

of the fiduciary duties owed by EQT to Plaintiff and the Class Members.

133.     Plaintiff and the Class Members have been damaged as a proximate result thereof

and are entitled to recover their actual damages from EQT, statutory, equitable, or other

prejudgment interest at the maximum lawful rate, punitive damages, and any and all other relief

deemed appropriate by the Court.

**COUNT VII**

**UNJUST ENRICHMENT**

134.     Plaintiff restates and incorporates herein by reference all the allegations contained

in the above-numbered paragraphs.

135.     Benefits attributable to Plaintiff's and the Class Members' CBM ownership

interests, including CBM production volumes, sales proceeds, attendant tax credits, and other

benefits, were conferred on EQT by Plaintiff and the Class Members. EQT knew of such benefits

and should reasonably have expected to repay Plaintiff and the Class Members for same. EQT

accepted and retained such benefits without paying Plaintiff and the Class Members for the value

of the benefits, and accepted and retained such benefits under circumstances that render it

inequitable for EQT to retain the benefits without paying Plaintiff and the Class Members for the

value of same.

136.     Plaintiff and the Class Members are entitled to recover the value of the benefits

attributable to Plaintiff's and the Class Members' ownership interests that were accepted and

retained by EQT, statutory, equitable, or other prejudgment interest at the maximum lawful rate,

punitive damages, and any and all other relief deemed appropriate by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands as follows on behalf of himself and the

Class:

1.      That a class be certified by the Court as soon as practicable, and that this action

proceed as a class action with Plaintiff serving as Class Representative for the Class and with

counsel for Plaintiff serving as Class Counsel;

2.      That the Court enter a judgment declaring the respective rights and obligations of

the parties as described and requested above;

3.      That the Court award injunctive relief requiring EQT to properly account to

Plaintiff and the Class Members as described and requested above;

4.      That Plaintiff and the members of the Class recover full compensatory damages

from Defendants in respect to the claims asserted against them, respectively, and that EQT

disgorge and pay over to Plaintiff and the members of the Class all of EQT's ill-gotten gains as

described and requested above;

5.      That Plaintiff and the members of the Class recover punitive damages against

EQT as determined by a jury;

6.      That Plaintiff and the Class Members recover pre-judgment, post-judgment, and

equitable interest on all amounts awarded hereunder;

7.      That Plaintiff and the Class Members recover reasonable attorneys' fees and costs

of this action;

8.      That this Honorable Court grant Plaintiff and the Class Members all additional

relief as may be just and proper and to which the Plaintiff and the members of the Class may be

entitled; and

9.      That Plaintiff and the Class Members be given a trial by jury.

Respectfully submitted,

Dated:  July 27, 2010                                ROBERT ADAIR

By:   /s/ Larry D. Moffett
Larry D. Moffett
DANIEL COKER HORTON & BELL, P.A.
265 North Lamar Blvd., Suite R
P. O. Box 1396
Oxford, MS 38655
Telephone: (662) 232-8979
Facsimile:  (662) 232-8940
lmoffett@danielcoker.com

Peter G. Glubiak, Esq. (VSB 31271)          Don Barrett
GLUBIAK LAW OFFICE                          Brian Herrington
11165 West River Road                       Katherine B. Riley
P.O. Box 144                                David M. McMullan, Jr.
Aylett, VA  23009                           BARRETT LAW GROUP, P.A.
Telephone:  (804) 769-1616                  404 Court Square North
Facsimile:   (804) 769-1897                 P.O. Drawer 927
glubiaklaw@aol.com                          Lexington, MS  39095
                                            Telephone:  (662) 834-2488
                                            Facsimile:  (662) 834-2628
                                            dbarrett@barrettlawoffice.com
                                            bherrington@barrettlawgroup.com
                                            kbriley@barrettlawoffice.com
                                            dmcmullan@barrettlawoffice.com

David S. Stellings                          Charles F. Barrett
Steven Fineman                              Attorney at Law
Jennifer Gross                              6518 Highway 100, Suite 210
Elizabeth Alexander                         Nashville TN 37205
LIEFF, CABRASER, HEIMANN                    T: 615.515.3393
   & BERNSTEIN, LLP                         F: 615.515.3395
250 Hudson Street, 8th Floor                charles@cfbfirm.com
New York, NY 10013
Telephone:  (212) 355-9500

Facsimile:   (212) 355-9592
dstellings@lchb.com
sfineman@lchb.com
ealexander@lchb.com
jgross@lchb.com


Richard R. Barrett
Law Offices of Richard R. Barrett
P. O. Box 339
404 Court Square North
Lexington, MS 39095
T: 662.834.4960
F: 866.430.5459
rrb@rrblawfirm.net

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel does hereby certify that he has this day served a true and correct

copy of the above and foregoing upon all counsel of record via ECF notification and/or by e-

mail.

Wade W. Massie, VSB # 16616
Mark E. Frye, VSB #32258
Penn Stuart & Eskridge
P. O. Box 2288
Abingdon, VA 24212
T: 276.628.5151
F: 276.628.5621
wmassie@pennstuart.com

This the 27th day of July, 2010.

*/s/ Larry D. Moffett*
Larry D. Moffett
Attorney for Plaintiff