UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| **ROBERT ADAIR, on behalf of himself and all others similarly situated,**<br><br>    **Plaintiff,**<br><br> **v.**<br><br>**EQT PRODUCTION COMPANY, ARLIE J. LAMBERT & ANN P. LAMBERT, RAYMOND LOFTIN & LINDA LAMBERT LOFTIN, G. WORTH PEGRAM, JR. & BERNICE LAMBERT PEGRAM, ARTHUR AMOS & ABBIE LAMBERT AMOS, JERRY SHORT & ROSE LAMBERT SHORT, HARRIS McGIRT & JOAN LAMBERT McGIRT, GREG LAMBERT, C. W. DOTSON & MARY FRANCES L. DOTSON, OCIE G. SUTHERLAND, DENNIS SUTHERLAND & CHARLOTTE SUTHERLAND, DON RAINEY & LINDA CAROL RAINEY,  LAMBERT LAND LLC, and JOHN DOES A-Z,**<br><br>    **Defendants.** | **Case No. 1:10-cv-00037** |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT EQT PRODUCTION COMPANY'S MOTION TO DISMISS AMENDED COMPLAINT**

**I.**  <u>**INTRODUCTION**</u>

  Plaintiff brings this case on behalf of himself and certain owners of gas interests in

Buchanan, Dickenson, Lee, Russell, Scott and Wise Counties, Virginia ("Subject Virginia

Counties"). Plaintiff and Class Members are the owners of gas estates/interests in tracts that are

included in coalbed methane gas ("CBM") drilling units operated by EQT Production Company

("EQT").  According to EQT's filings with the Virginia Gas and Oil Board ("Board"), Plaintiff's

and Class Members' rights as gas owners to the CBM in those tracts conflict with the ostensible

rights of coal owners to the CBM.

  For years, EQT has produced and sold substantial quantities of CBM that are attributable

to Plaintiff's and the Class Members' gas ownership interests, but it has never properly

accounted to Plaintiff and the Class Members for same.

EQT has taken possession of and sold CBM attributable to Plaintiff's and the Class Members' gas interests by taking undue and/or unlawful advantage of certain provisions of the Virginia Gas and Oil Act, VA. CODE ANN. §§45.1-361-1, *et seq.* ("the Act"), which permit the production and sale of CBM in the face of "conflicting claims" of CBM ownership.  EQT repeatedly represented to the Board that there were conflicting CBM ownership claims as between gas owners (Class Members), on the one hand, and coal owners (the Coal Owner Defendants) on the other hand.  EQT instituted proceedings before the Board that resulted in the entry of orders that pooled all interests or estates in CBM drilling units, appointed EQT as operator of the CBM units, and – critical to this lawsuit – provided that Plaintiff and the Class Members were deemed, "subject to a final legal determination of ownership," to have leased their CBM interests in the units to EQT, the CBM Unit operator. *See* VA. CODE ANN. §45.1-361.22(6).

EQT thereupon proceeded to produce and sell CBM that belonged to Plaintiff and the Class Members, and it was obligated, under §45.1-361.22(4) of the Act, to place all proceeds attributable to Plaintiff's and the Class Members' interests into escrow, pending judicial resolution of the "conflicting claims" of CBM ownership. Such money has never been paid to Plaintiff and the Class Members.

EQT deprived Plaintiff and the Class Members of their CBM production and/or production revenues by claiming that the Coal Owner Defendants own the CBM as a result of their coal ownership interests and/or that EQT had the right to take possession of and sell the CBM as the Coal Owner Defendants' lessee.

EQT's claims and course of conduct are unfounded and contrary to the law.  The Virginia Supreme Court held six years ago that CBM "is a distinct mineral estate" from coal, and that

landowners retain the rights to CBM located on their property when they convey or lease coal rights only. *Harrison-Wyatt, LLC v. Ratliff*, 593 S.E.2d 234, 238, 267 Va. 549, 556 (2004).

A new state law codifies the *Ratliff* rule. VA. CODE ANN. §45.1-361.21:1: "A conveyance, reservation, or exception of coal shall not be deemed to include coalbed methane gas." Therefore, controlling statutory and common law in Virginia hold that Plaintiff and the Class Members own the CBM that is produced from the lands in which they own gas interests, and that the Coal Owner Defendants do not own the CBM.

The "deemed leases" imposed on the Class Members were conditionally imposed, in that those "leases" are, in accordance with VA. CODE ANN. §45.1-361.22(6), "subject to a final legal determination of ownership." Plaintiff's primary goal in this case is to obtain from this Court the "final legal determination of ownership" that the statute requires, which – under the plain language of the Act – would nullify Plaintiff's and Class Members' deemed leases. The ownership determination would have substantial benefits to Plaintiff and the Class Members, including entitling them to finally receive the many years' worth of their money that has been held in escrow or retained by EQT for its own use as a result of ownership conflicts that do not truly exist.

EQT's Memorandum in Support of Motion to Dismiss Amended Complaint (Doc. 78; hereinafter "Brief") is replete with mischaracterizations of Plaintiff's claims, and attempts to improperly recast Plaintiff's claims as something they are not. For example, an oft-repeated mischaracterization is EQT's assertion that Plaintiff's claims are based on the theory that the Board's "pooling orders" are void once ownership is determined. *See, e.g.,* Brief at 3, 7, 13 and 14. Plaintiff contends no such thing, and it is obvious that EQT has intentionally misrepresented the allegations of Plaintiff's Complaint. For example, on page 7 of its Brief, EQT states: "As in his original Complaint, Plaintiff contends that pooling orders are void once ownership of coalbed

methane gas is determined.  Amended Complaint, ¶51."  EQT's mischaracterization is revealed by simple reference to the cited Paragraph 51 of Plaintiff's Amended Complaint which states in its entirety: "Such a 'final legal determination of ownership' of the CBM in favor of Plaintiff and the Class Members will underline the deemed leases conditionally imposed upon them, voiding the deemed leases *ab initio*, and Plaintiff requests the entry of a declaratory judgment to that effect." (Emphasis added.) Thus, Plaintiff claims only that the deemed leases are void once ownership is determined, and it is improper for EQT to represent to this Court that Plaintiff is asserting that the pooling orders are void.[1]

Plaintiff will not attempt here to identify all of EQT's other mischaracterizations, but instead simply refers this Court to Plaintiff's Amended Complaint, which sets forth factual allegations and the legal bases of Plaintiff's claims in a clear, straightforward, and compelling manner.  Plaintiff has stated viable claims based on well-pled factual allegations which must be taken as true; well-founded principles of law; and the plain language of the Act. There simply are no grounds for dismissal. This critically important litigation must proceed forward so that (a) the "conflicting claims" of CBM ownership can be determined and resolved in favor of Plaintiff and the Class Members; (b) Plaintiff and the Class Members can -- at long last -- receive the millions of dollars due them as the true CBM owners; and (c) EQT can be required to properly account to

---

[1] EQT's misrepresentation is not an isolated, unintentional one, for EQT makes the misrepresentation multiple times, including on page 3 of its Brief ("Plaintiff bases this claim on the theory that pooling orders are 'void *ab initio*' once ownership is determined."); page 7 ("As in his original Complaint, Plaintiff contends that pooling orders are void once ownership of coalbed methane gas is determined. Amended Complaint, ¶51."); page 13 ("Plaintiff's first argument in support of his claim for eight-eighths is based on the theory that a pooling order is void once ownership of the coalbed methane gas is determined."); and page 14 ("In his Amended Complaint, Adair claims that once a person is determined to be an owner of coalbed methane gas, the pooling order is no longer in effect, and the well operator becomes a trespasser. Amended Complaint, ¶51.").  Plaintiff should not have to spend time identifying and correcting such blatant misstatements but, more importantly, such a pattern of intentional misrepresentations raises serious questions about EQT's candor.

Plaintiff and the Class Members for its wrongful acts and omissions, including its mishandling and misappropriation of Plaintiff's and the Class Members' properties and monies.[2]

## II.   <u>STANDARD OF REVIEW</u>

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint.  *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).  Such motions are generally viewed with disfavor.  *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496,498 (5th Cir. 2000).

When ruling on a motion to dismiss, the court must take the allegations in the complaint as true.  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Witthohn v. Fed. Ins. Co.*, 164 Fed. Appx. 395, 396 (4th Cir. 2006).  The court may not consider materials outside of the complaint without converting the motion to one for summary judgment.  *Id*. at 397.  *See also* Fed. R. Civ. P. 12(d) ("If on a motion under Rule 12(b)(6) ... matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").  If a court were to consider materials outside of the complaint and thereby convert a motion to dismiss to one for summary judgment, the court must give all parties "reasonable opportunity to present all material made pertinent to such motion by Rule 56."  Fed. R. Civ. P. 12(b). *See also Plante v. Shivar*, 540 F.2d 1233, 1235 (4th Cir. 1976).  This "reasonable opportunity" includes some indication by the court to all parties that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the opposing party to file counter affidavits or to pursue reasonable discovery."  *Plante*, 540 F.2d at 1235.

---

[2] EQT gratuitously suggests that Plaintiff has abandoned its contention that EQT is "stealing people's gas." (Brief at 1) While the parties may disagree about the proper "label" to attach to EQT's conduct, Plaintiff continues to allege in its Amended Complaint that EQT improperly retained, for its own use and benefit, CBM and/or CBM sales proceeds (money) owned by Plaintiff and the Class Members. Plaintiff has abandoned nothing and continues to maintain a civil action for conversion a/k/a "stealing."

III.   **ARGUMENT**

A.   **EQT Should Identify the "John Doe" Coal Owners.**

EQT first argues that Plaintiff's Amended Complaint must be dismissed because Plaintiff has not (yet) specifically named all of the coal owner defendants but has, instead, named "John Does A-Z" as defendants and stated that those additional persons and entities will be specifically named as defendants upon Plaintiff's receipt of the necessary identifying information from EQT. (Brief at 9-12)  EQT's argument is incorrect and, indeed, quite puzzling given that Plaintiff is attempting, in good faith, to address and cure one of the objections EQT raised to Plaintiff's original Complaint.

In his original Complaint (Doc. 1), Plaintiff did not name any of the coal owners as defendants.  EQT moved to dismiss, asserting that the coal owners are necessary parties and must be joined.  (Doc. 10 at 10-12) Plaintiff thereupon undertook to amend his complaint and, *inter alia*, added the coal owners as defendants in accordance with EQT's insistence that Plaintiff do so.  In order to accomplish this, Plaintiff (a) specifically named the 21 persons and entities who have been identified by EQT in its filings with the Board as coal estate owners that (allegedly) have "conflicting claims" with the "N. K. Rasnick Heirs" (including Plaintiff), and (b) also named "John Does A-Z" as defendants, describing them as follows:

> The "John Does A-Z" Defendants are the additional persons and entities who have been identified by EQT in its filings with the Board as coal owners that (allegedly) have "conflicting claims" with absent Class Member gas owners in respect to the ownership of CBM produced from CBM Units operated by EQT.  The complete identity of the John Doe defendants is currently unknown by Plaintiff, but the identity of those defendants is known by EQT, and Plaintiff will name them as specific parties defendant upon Plaintiff's receipt of the necessary information from EQT.

(Amended Complaint ¶25)

There obviously is no disagreement between Plaintiff and EQT as to whether the other coal owners should be specifically named as defendants; the only issue is how and when this must be accomplished.  There certainly would be no basis for dismissal on Rule 19 grounds until after Plaintiff has been given a reasonable opportunity through discovery to identify and join the other coal owners, and unless Plaintiff thereafter failed to join them, whereupon the Court would determine if the action should proceed against the existing parties or be dismissed. *See* Fed. R. Civ. P. 19.  Simply put, there is no basis for Rule 19 dismissal at this stage of the proceedings.

The use of John Doe defendants is permissible in federal court when "the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery."  *Pool v. Pass*, 351 F. Supp. 2d 473, 478 n. 8 (E.D.Va. 2005) (quoting *Njoku v. Unknown Special Unit Staff*, 2000 U.S. App. LEXIS 15695, at *2 (4th Cir. 2000) (unpublished disposition)).  In the instant action, it is undisputed that Plaintiff is not aware of the identity of all of the coal owners. It is also undisputed that Plaintiff will be able to identify those owners through the discovery process.

EQT asserts that, before filing his Amended Complaint, Plaintiff should have obtained the names of all of the coal owners from the Board's files.  But EQT operates several thousand CBM wells, and it is simply not reasonable to require Plaintiff to manually retrieve and review thousands of files and pages of documents to come up with a coal owner list that EQT can generate with relative ease. EQT has all the necessary records because, among other things, EQT prepared and filed, for each and every one of its CBM Units, schedules listing the names and addresses of the persons and entities who allegedly have conflicting claims to the ownership of the CBM.  Based on the custom and practice in the gas industry, EQT will also have an electronic database listing each CBM Unit and listing, for each Unit, the names and addresses of all of the owners and potential owners in the Unit, including the "conflicting claimants," e.g., the

names and addresses of the subject coal owner defendants.  After all, EQT is obligated to make monthly deposits of proceeds into the Board's escrow account attributable to the "conflicting interests" and must, therefore, maintain division of interest schedules for such purposes, in both hard copy and electronic form.

EQT argues that, because Plaintiff could undertake a (lengthy) review of the Board's public records to obtain the identity of the coal owners, Plaintiff must obtain the desired information from the Board.  To the contrary, "[a]s a general rule, equal availability of information is not a ground for objection or resisting production." *Berrios v. Hovic*, 2009 U.S. Dist. LEXIS 6394, at *3 (D.V.I. Jan. 28, 2009) (citing *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 514 (N.D. Iowa 2000); *Swarthmore Radiation Oncology, Inc. v. Lapes*, Civil No. 92-3055, 1993 U.S. Dist. LEXIS 17555, at *2, 3 (E.D.Pa. Dec. 1, 1993)).  Plaintiff acknowledges that Fed. R. Civ. P. 26(b)(2)(i) allows a court to limit discovery that "is obtainable from some other source that is more convenient, less burdensome, or less expensive."  Here, this rule works in Plaintiff's favor, because obtaining the subject information from the Board would be *less* convenient, *more* burdensome, and *more* expensive, than obtaining records that EQT already has in a readily accessible form.  This is especially true in situations where – like here – obtaining the same information from public records would require a laborious and uncertain process.  *See*, *e.g.*, *Scott v. Scott*, Civil No. CH95-30, 1998 Va. Cir. LEXIS 229, at *2 (Va. Cir. Jan. 8, 1998) (compelling plaintiff to produce deeds, deeds of trust, and mortgages requested by defendant that were in plaintiff's possession, custody, or control instead of requiring defendant to obtain those documents from various clerks' offices throughout state).

The pragmatic and practical solution to joining the subject coal owners is to require EQT to provide the necessary information to Plaintiff through discovery.  EQT will be obligated to

produce that information under its initial disclosure obligations and/or pursuant to an appropriate discovery request, at which time Plaintiff will be able to replace the John Doe defendants with the specifically-named coal owners.

As "EQT supports efforts to resolve conflicting claims of ownership to coalbed methane gas . . . ," (Brief at p. 2), EQT should be willing to – and in the face of any reluctance, be required to – produce the names and addresses of John Does A-Z so that this matter may proceed as quickly as possible.

### B. Plaintiff and Class Members Are Entitled to All (Eight-Eighths) of the Proceeds Attributable to Their Gas Interests, Net of Operational Costs.

EQT argues that upon a final legal determination of ownership in their favor, Plaintiff and the Class Members will be entitled to receive only a 1/8th royalty interest that "remains in place for the life of the well." (Brief at 13)  While EQT would obviously prefer to keep 7/8ths of Plaintiff's and the Class Members' interests for itself, its argument ignores the plain language of the Act.

### 1. Plaintiff does not challenge the pooling orders.

EQT's first argument is premised upon a fundamental mischaracterization of Plaintiff's Amended Complaint. EQT contends that Plaintiff is arguing that the subject pooling orders are void once a final legal determination is made regarding conflicting claims of ownership. (Brief at 13)

Plaintiff does not contend that his requested determination of ownership will void the subject pooling orders or otherwise invalidate the provisions of the orders that allow for the establishment of the subject CBM Units and the forced pooling of gas interests in the Units.[3]

---

[3] EQT argues at great length about pooling:  the constitutionality of pooling, the policy goals that underlie the pooling statute, and the validity of the regulatory framework that provides for pooling. Plaintiff does not challenge the authority of the Commonwealth to enact a pooling statute, or dispute the policy goals of the Act. Nor does Plaintiff dispute the provisions of the Act that provide for forced

Rather, Plaintiff contends, consistent with the Act, that the ownership determination affects only the deemed leases, which were created expressly "subject to" such a "final legal determination of ownership." *See* §45.1-361.22(6) (deemed lease provisions). Plaintiff is requesting that the Court apply *Ratliff* and §45.1-361.21:1 and make an ownership determination in favor of Plaintiff and the Class Members. Such a "final legal determination of ownership" in favor of Plaintiff and the Class Members will nullify the deemed leases that were conditionally imposed upon them and void the deemed leases *ab initio*, thereby entitling them to be treated as non-conflicted, unleased mineral owners as to those Unit tracts in which their interests are located. This result establishes and confirms the true/proper ownership of interests in the subject Unit tracts, but does not affect the establishment of the Units, the pooling of interests in the Unit, nor EQT's status as the operator of the Units.

### 2.     EQT is Obligated to Account to Plaintiff and the Class Members on an 8/8ths Basis.

Plaintiff asserts that upon a determination of ownership in favor of Plaintiff and the Class Members, the deemed leases will be nullified and Plaintiff and the Class Members will be entitled to receive all (8/8ths) of the proceeds that are attributable to their now "non-conflicted" interests, net of operating costs. EQT, on the other hand, claims that the deemed leases have been permanently imposed, and that in the event the ownership issue is decided in Plaintiff's favor, Plaintiff and the Class Members will be entitled to receive only 1/8th royalty payments for both past and future production. (Brief at 13) This dispute centers primarily on the proper interpretation of the Act's "deemed lease" and escrow account provisions, found in §§45.1-361.22(6), and 45.1-361.22(4), respectively.

---

pooling upon application by a proposed operator, whether there are competing claims of ownership or not. Pooling is simply irrelevant to the claims raised by the Amended Complaint.

Plaintiff's position is based on a straightforward application of the Act, including the following:

1.    The statute's language plainly states that the deemed leases are conditional, i.e., they are "subject to a final legal determination of ownership."

2.    When the deemed leases were put in place, EQT, as the lessee, became a "gas owner" holding leasehold interests attributable to "conflicting interests," i.e., EQT derived its lessee status/leasehold interest from gas owners whose CBM ownership was uncertain and in "conflict" with the CBM ownership claims of coal owners. *See* §45.1-361.1 ("gas or oil owner" is defined as "any person who owns, <u>leases</u>, has an interest in, or who has the right to explore for, drill, or operate a gas or oil well as principal or as <u>lessee</u>" (emphasis added)).

3.    As a "gas owner" holding leasehold interests attributable to "conflicting interests," EQT opted to become a "participating operator," which is a term defined by the Act to mean "a <u>gas</u> or oil <u>owner</u> who elects to bear a share of the risk and cost of drilling, completing, equipping, operating, plugging and abandoning a well on a drilling unit and to receive a share of production from the well equal to the proportion which the acreage he owns or holds under lease bears to the total acreage of the drilling unit." Section §45.1-361.1 (emphasis added).

4.    Section 45.1-361.22(4) of the Act provides: "The coalbed methane gas well operator shall deposit into the escrow account one-eighth of all proceeds attributable to the conflicting interests **plus** all proceeds in excess of ongoing operational expenses as provided for under §45.1-361.21 and the order of the Board attributable to a <u>participating</u> or non-participating <u>operator</u>." (Emphasis added.)  EQT was, therefore, supposed to pay into the Board's escrow account <u>all</u> of the sales proceeds, net of operating expenses, that were attributable to the "conflicting interests," including the 1/8th deemed lease royalties <u>plus</u> the 7/8ths "participating operator" proceeds (net of operational expenses).  In other words, because EQT's leasehold interests under the deemed leases were derived from "conflicting interests," EQT was not free to retain any "conflicting interest" proceeds for its own use and benefit, but was instead required by the Act to place <u>all</u> conflicting interest proceeds (net of operating expenses) into escrow so those proceeds would be available to the true owners (here, the Class Members) upon a final legal determination of ownership in their favor.

5.    When there has been a "final legal determination of ownership" in favor of Plaintiff and the Class Members, the deemed leases -- which were conditionally imposed ("subject to a final legal determination of ownership") -- will be nullified automatically, and the Class Members will

thereupon be non-conflicted, unleased mineral owners (a) entitled, as to past production, to receive all (8/8ths) of the proceeds that are attributable to their interests (net of proper operating costs), with such money to be paid from the Board's escrow account (and/or paid by EQT to the extent EQT failed to deposit the proceeds into escrow); and (b) entitled, as to future production, to receive all (8/8ths) of the CBM production and sales proceeds that are attributable to their unleased interests, net of operating costs.

EQT, on the other hand, contends that:

1.     The deemed leases remain in place for the life of the subject wells.

2.     EQT was only obligated to place 1/8th royalties into escrow, and could keep the 7/8ths proceeds for itself (even though the 7/8ths proceeds are derived from "conflicting interests").

3.     If Plaintiff and the Class Members prevail on the ownership issue, they can only recover 1/8th royalties from escrow as to past production and 1/8th royalties as to all future production by EQT.

### a.     Deemed Leases: Conditional or Permanent?

The parties' disagreement about the deemed leases is premised upon the meaning of the phrase "subject to a final legal determination of ownership" in §45.1-361.22(6).  In construing the statute, this Court must apply its plain, obvious and rational meaning and give the words their common, ordinary and accepted understanding.  *Dodge v. Trustees of Randolph-Macon Woman's College*, 661 S.E.2d 805, 808 (Va. 2008); *Rose v. Commonwealth*, 673 S.E.2d 489, 509 (Va. App. 2009); *Young v. The Virginia Birth-Related Neurological Injury Compensation Prog.*, 620 S.E.2d 131, 138 (Va. App. 2005).  This Court must also construe the statute consistent with its spirit and reason, seek to follow the true intention of the General Assembly, and adopt that sense of the words which harmonizes best with the context and promotes in the fullest manner the apparent policy and objectives of the General Assembly. *Town of Falls Church v. Board of Sup. of Fairfax Cty.*, 144 S.E. 870, 873 (Va. 1928); *Jones v. Rhea*, 107 S.E. 814, 823 (Va. 1921); *Ipsen v. Moxley*, 642 S.E.2d 798, 801 (Va. App. 2007).  The Court should presume that the General Assembly never intends the application of a statute to work irrational consequences.

12

*F.B.C. Stores, Inc. v. Duncan*, 198 S.E.2d 595, 598 (Va. 1973).  Where a statute is susceptible of two constructions, one which would cause the statute to be constitutional and one which would cause the statute to be unconstitutional, the Court must adopt the former.  *Adams Express Co. v. Charlottesville Woolen Mills*, 63 S.E. 8, 10 (Va. 1908).

EQT argues the subject phrase is simply "a limitation upon the right of a claimant to continue to participate as a lessor. If the claimant is determined not to be an owner, his rights as lessor come to an end."  (Brief at 15)  But EQT's argument makes no sense.  It is obvious that if a claimant is not a true owner, he never had any "rights as lessor" to begin with.  The General Assembly did not need to put language in the Act to clarify the obvious: You cannot lease what you do not own.  *See Cape Henry Towers, Inc. v. National Gypsum Co*., 331 S.E.2d 476, 479 (Va. 1985) (in interpreting statute, it must be assumed that statute is purposeful and not unnecessary or vain); *McFadden v. McNorton*, 69 S.E.2d 445, 461 (Va. 1952) (statute should be interpreted so that it may have effect and not be found vain and elusive).  And EQT's assertion that the subject phrase limits "the right of a claimant to continue to participate as a lessor," ignores the fact that a claimant who does not actually own any interest would <u>never</u> "participate as a lessor" because the Act's escrow provisions ensure that proceeds are <u>never</u> paid to non-owners.

The phrase "deemed, subject to a final legal determination of ownership" plainly means that the lease is being <u>conditionally</u> imposed and that when the ownership issue is resolved, the gas owner will no longer be "deemed" to have leased his interest, i.e., the lease will be nullified. *See City of Lynchburg v. English Constr. Co., Inc*., 675 S.E.2d 197, 201 (Va. 2009) (under the "last antecedent doctrine" for statutory construction purposes, qualifying words ["subject to a final legal determination of ownership"] refer solely to the last word, phrase or clause

["deemed"]). *See also* BALLENTINE'S LAW DICTIONARY ("subject to" are "words of qualification" and "words of condition").

This interpretation is not only consistent with the plain, ordinary meaning of the phrase, it is the construction that best promotes the purpose of the Act – to allow CBM wells to be drilled in the face of conflicting claims and to escrow and protect CBM sales proceeds for distribution to the true owners upon the legal resolution of conflicting claims. *See Dowdy v. Franklin,* 121 S.E.2d 817, 819 (Va. 1961) (court must make reasonable construction so that purpose of statute will not be limited or defeated, but instead will be promoted). As EQT correctly notes, the General Assembly, in passing the Act, "allowed development to come first and resolution of conflicting claims to come later." (Brief at 13)

The Virginia Supreme Court has analyzed "words of condition" in the context of a will that granted real property. *Meek v. Fox*, 118 Va. 774, 88 S.E. 161 (1916). The Court adopted the general rule that "when [words] render the estate liable to be defeated in case the event expressed should arise before the determination of the estate, they are words of condition." *Id*. at 162 (quoting *Atlanta Railway Co. v. Jackson*, 108 Ga. 634, 34 S.E. 184 (1899)). Given their plain legal meaning, "subject to a final legal determination of ownership" are words of condition that "render the estate liable to be defeated" when the condition occurs. The "estate," by analogy, would be a lease. Therefore, upon the determination of ownership, the deemed lease is nullified or "defeated."

Only Plaintiff's interpretation is consistent with Virginia's principles of statutory construction. Plaintiff's interpretation gives meaning to the words chosen by the General Assembly and does not render them unnecessary or vain, as EQT's interpretation would.

### b.   The Escrow Issue: 1/8th or 8/8ths?

The parties' next disagreement relates to EQT's escrow obligations under §45.1-361.22(4). Plaintiff contends the Act obligates EQT to deposit into escrow <u>all</u> of the proceeds, net of operations costs, that are attributable to conflicting claims.  EQT acknowledges that "the Act provides for the establishment of an escrow account in which the proceeds attributable to conflicting claims are paid" (Brief at 14), but EQT later retreats from that concession and asserts it was only obligated to pay royalties (1/8th proceeds) into escrow. (Brief at 15)  EQT further argues: "According to Plaintiff, once conflicting claims are resolved, the escrowed money must be paid to the owners. *Id*.  This is a complete misinterpretation of the statute."  (Brief at 16) EQT's assertion is a remarkable one, given that the statute unequivocally provides that <u>all</u> proceeds attributable to conflicting interests must be escrowed and paid <u>to the true owners</u> once the conflicting claims are resolved. The Act's escrow provisions would be meaningless if escrowed money need not be paid to the true owners, as EQT asserts.

EQT mischaracterizes the basis of Plaintiff's claims by stating that Plaintiff is contending EQT must pay into escrow the revenues due to EQT as "well operator."  (Brief at 18 and 19) Contrary to EQT's assertion, Plaintiff contends that EQT is obligated to pay into escrow the proceeds EQT received <u>as a "participating operator.</u>"  (Amended Complaint at ¶¶57-59) Thus, EQT's escrow obligations turn on the following question: As to the leasehold interests EQT (conditionally) held under the deemed leases, was EQT a "participating operator" -- yes or no? The answer -- found in the plain language of the Act -- is an unequivocal "yes."

EQT strives mightily to limit its status to one of "gas operator" or "well operator" and asserts it cannot be considered a "participating operator," but EQT <u>totally</u> <u>avoids</u> the dispositive definitions found in the Act. First, "gas or oil owner" is defined by §45.1-361.1 to mean "any person who owns, <u>leases</u>, has an interest in, or who has the right to explore for, drill, or operate a

gas or oil well as principal or as <u>lessee</u>." (Emphasis added.)  EQT is a <u>lessee</u> under the deemed <u>leases</u> and is, therefore, a "gas owner" holding leasehold interests attributable to "conflicting interests" (i.e., EQT derived its interests from gas owners whose claims of ownership – according to EQT – are in conflict with the CBM ownership claims of coal owners).

Second, it is clear that as to the leasehold interests EQT conditionally obtained via its deemed leases, EQT opted to become a "participating operator," which is a term defined by §45.1-361.1 of the Act to mean "a <u>gas</u> or oil <u>owner</u> who elects to bear a share of the risk and cost of drilling, completing, equipping, operating, plugging and abandoning a well on a drilling unit and to receive a share of production from the well equal to the proportion which the acreage he owns or holds under lease bears to the total acreage of the drilling unit." (Emphasis added.)

EQT states: "The well operator does not pay his own interest into escrow, as Plaintiff contends. Rather, the well operator pays the proceeds 'attributable to a participating or non-participating operator.'" (Brief at 18) But EQT <u>is</u> a participating operator as to the leasehold interests it conditionally obtained via the deemed leases. In other words, EQT "wears two hats": one as gas/well operator, and the other as a gas owner/participating operator holding leasehold interests attributable to "conflicting claims."

While EQT would obviously prefer to permanently keep 7/8ths of the monies attributable to Plaintiff's and the Class Members' "conflicting interests" for its own use and benefit, §45.1-361.22(4) prohibits EQT from doing so.  Indeed, <u>why</u> should EQT keep for its own use and benefit 7/8ths of the money that is attributable to "conflicting interests" instead of escrowing that money as the Act requires? What if it were to be determined that the Plaintiffs and the Class Members were <u>not</u> the true owners? EQT would have then appropriated for its own use money that belonged to someone else.  The legislature clearly required and contemplated that <u>all</u> proceeds attributable to "conflicting interests" would be escrowed.

This is not only apparent from the plain language of the Act, it is also consistent with the Act's legislative history as reflected in House Document No. 79, Commonwealth of Virginia, "Report of the Virginia Coal and Energy Commission on the Study of the Regulation of Independent Power Producers and the Oil and Gas Act" (1990), a copy of which is attached hereto as Exhibit 1. This report to the Governor and the General Assembly states, at page 7, under the topic of "Ownership Rights, Pooling and Conservation," the following:

> To remove the fear of "willful taking" lawsuits, industry representatives suggested repealing the "Migratory Gas Act" and enacting emergency special pooling provisions for coalbed methane gas. The special pooling provisions would allow for the rapid development of the resource in order to take advantage of the federal tax credit. **All proceeds** <u>derived from the production of the gas</u> **would be escrowed** <u>pending a subsequent determination of ownership specifying who would receive what portion of the escrowed proceeds</u>.

(Emphasis added.)  "All" proceeds.

EQT argues that "[u]nder Plaintiff's interpretation, an operator could not securely drill a well unless he held a 100% interest in the coalbed methane gas. Otherwise, the operator would stand to lose revenue from the well once ownership is determined." (Brief at 15) This argument by EQT is faulty for several reasons. First, there is nothing in the statute that purports to guarantee the operator a 100% interest. Wells are commonly and often drilled throughout the country with the operator holding significantly less than a 100% interest in the well.  Note, for example, VA. CODE ANN. §45.1-361.21(c)(3), which pertains to the pooling of conventional gas wells and requires a proposed operator to have rights to only 25% of the acreage in the unit.

Second, EQT argues that it "would stand to lose revenue from the well once ownership is determined" (Brief at 15), but EQT's predictable desire to have a risk-free operation is inconsistent with the plain meaning of the Act.  EQT could have procured gas leases on a negotiated, market-value basis if it wanted to fully protect its position, and EQT has procured

17

many such leases from both gas owners and coal owners. Indeed, the Act, as properly interpreted, incentivizes and encourages gas companies such as EQT to procure leases from landowners on market-based terms, because with only a conditional "deemed lease" the operator is guaranteed the recovery of its costs, but it is risking that all of the proceeds would eventually flow to the landowner if the landowner were to win the "final legal determination."[4]  EQT's stated preference and goal of holding 100%, risk-free working interests implicitly reveals EQT's true intentions: to obtain as much leasehold interests as possible by "gaming the system," improperly inducing or forcing unleased mineral owners into "deemed leases," and improperly attempting to have those deemed leases imposed on a permanent basis. (*See* Amended Complaint ¶¶80-82).

Finally, EQT points out the options that were (supposedly) made available to conflicting claimants and asserts that Plaintiff and the Class Members could have, themselves, affirmatively elected to become a "participating" or "non-participating" operator. (Brief at 17-18)  The Act, however, also gave Plaintiff and the Class Members the option to "do nothing," in which event their interests would be "deemed leased" until their ownership was confirmed.  The Act was clearly designed to not punish them for electing that path. Instead, as discussed above, the Act's "deemed lease" and escrow provisions work together to (a) clarify the legal authority of the operator to produce and sell the CBM attributable to "conflicting claims" until the CBM ownership claims could be resolved, and (b) preserve and protect for the true owners all of the proceeds attributable to the conflicting interests.

---

[4] Without this last incentive, which flows from the statutory interpretation Plaintiff is urging, the Act would unconstitutionally take away from the landowner one of his most important attributes of ownership: the "executive right," which is the right to be able to negotiate a fair lease, as dictated by the free market. *See* §III(E)(1), *infra.*

### C.     Plaintiff's Claims are Not Barred by the Pooling Orders or by Virginia Code <u>Section 45.1-361.9.</u>

EQT states that the "pooling orders direct how the proceeds are to be paid" and argues "[t]o the extent that plaintiff seeks payments contrary to these orders, plaintiff's claims are barred by Virginia Code §45.1-361.9." (Brief at 19)  EQT's argument is plainly wrong.

First, the Board lacks the authority to adjudicate ownership of CBM, which is the primary issue presented to this Court for decision, and the Board has never made any determination about the ownership of the CBM under Plaintiff's tract.[5]  Indeed, EQT and the Board have both publicly stated that the Board does not have the authority to make "a final legal determination of ownership."  The Act, instead, requires that such disputes be decided by <u>courts</u> outside of the regulatory scheme.  *See* §45.1-361.22(5) ("[t]he Board shall order payment of principal and accrued interest, less escrow account fees, from the escrow account to conflicting claimants only after (i) <u>a final decision of a court of competent jurisdiction adjudicating the ownership of coalbed methane as between them</u> . . . .". (emphasis added)).  Plaintiff filed this case to obtain that final decision.

Second, Plaintiff's claims are not inconsistent with the pooling orders.  For example, EQT asserts that the pooling orders, among other things, "directed that royalties due conflicting owners be paid into escrow" (Brief at 19), but the pooling orders do <u>not</u> -- as EQT asserts -- limit EQT's escrow payment obligations to "royalties."  This is confirmed by one of the pooling

---

[5] *Cf. State Farm Mut. Auto. Ins. Co. v. Industrial Pharmacy Mgmt., LLC*, Civ. No. 09-00176, 2009 U.S. Dist. LEXIS 70699 at \*14 (D. Haw. 2009) ("In order to be an impermissible collateral attack of an earlier judgment, the relevant claims must have been directly ruled on in the prior proceeding.").  To trigger the collateral attack doctrine, "the earlier judgment must actually address that specific issue and make a determination in order for the doctrine to apply." *Id.* at \*15, (citing *Pub. Util. Dist. No. 1 of Grays Harbor Cty. Washington v. IDACORP Inc.*, 379 F.3d 641, 652 n. 12 (9th Cir. 2004) (finding no impermissible collateral attack "[i]n the absence of a finding by [the agency]," even though the plaintiff had "advanced arguments" as to the specific issue in the proceedings before the agency)).

19

orders EQT attached as Exhibit 1 to its Brief.[6] The pooling order provides: "If any payment of bonus, royalty payment <u>or other payment</u> due and owing pursuant to Va. Code §45.1-361.22 cannot be made <u>because the person entitled thereto cannot be made certain due to conflicting claims of ownership</u> and/or a defect or cloud on the title, then such cash bonus, royalty payment, <u>proceeds in excess of ongoing operational expenses</u>, or other payment . . . shall not be commingled with any funds of the Unit Operator [and] <u>shall be deposited by the Operator into the Escrow Account</u> . . . . Such funds shall be held for the exclusive use of, and sole benefit of, the person entitled thereto until such funds can be paid to such person(s) or until the Escrow Agent relinquishes such funds as required by law or pursuant to order of the Board." (Doc. 10-2 at §16-3, pp. 10-11 of 58 (emphasis added)).

Finally, EQT's argument about the pooling orders is simply another version of its "exhaustion of administrative remedies" argument, which the Court should reject for the reasons described in Section D, below.

### D.  There Are No Administrative Remedies To Be Exhausted.

EQT argues that Plaintiff's claims are based on violations of the relevant pooling orders and that Plaintiff was required to exhaust his administrative remedies before bringing the present lawsuit. (Brief at 20)

First, EQT either fails to understand Plaintiff's claims or it is purposely missing the point. Nowhere in Plaintiff's Amended Complaint does Plaintiff claim that EQT is in violation of the pooling orders. Rather, Plaintiff's primary goal in this case is to obtain from this Court the "final legal determination of ownership" that the Act requires, which – under the plain language of the Act – would nullify Plaintiff's and Class Members' deemed leases. This final legal determination

---

[6] As noted in §II, above, this Court should not consider the pooling orders in resolving the instant motion. Plaintiff simply refers to the pooling orders here for the sole purpose of pointing out and correcting EQT's misstatement.

is a remedy that the Board cannot provide to Plaintiff. Therefore, Plaintiff cannot exhaust his administrative remedies, because Plaintiff has no administrative remedy that could provide the ownership determination and the determination regarding damages that would flow to Plaintiff and Class Members from that ownership determination.

Administrative remedies that are inadequate need not be exhausted.  "We have held that where there is no administrative remedy equal to the relief sought, a complainant in a declaratory judgment proceeding, having no adequate legal remedy by judicial review, properly states a justiciable cause of action." *Mosher Steel-Virginia, Inc. v. Teig*, 229 Va. 95, 100-01, 327 S.E.2d 87, 91-92 (1985) (citing *James City Cty. v. Rowe,* 216 Va. 128, 132, 216 S.E.2d 199 (1975).  *See also Gayton Triangle Land Co. v. Henrico Cty.,* 216 Va. 764, 766-67, 222 S.E.2d 570, 572 (1976) (exhaustion not required where administrative action will not remedy impairment of rights); *Weyerhaeuser Co. v. Marshall,* 592 F.2d 373, 376 (7th Cir.1979) (exhaustion not required where no benefit gained); *Donovan v. Mosher Steel Co.,* Civ. No. 83-G-2173-S, 1985 U.S. Dist. LEXIS 23294, at **7-8 (N.D. Ala.1985) (counterclaim for declaratory relief in contempt proceedings proper where legal remedy inadequate and possibility of constitutional infringement is present).

In *CBC Holdings, LLC v. Dynatec Corp*., 680 S.E. 2d 40, 224 W.Va. 25 (W. Va. 2009), the Supreme Court of Appeals of West Virginia rejected a challenge similar to EQT's.  In *CBC Holdings,* Dynatec had leased coal rights from New Gauley Corporation, the owner of the coal seam underlying CBC Holdings' property. CBC Holdings filed a declaratory judgment action challenging Dynatec's right to extract coalbed methane from the seam. Plaintiff specifically sought a declaration that the lease agreement between Dynatec and New Gauley did "not include the mineral rights to the coalbed methane based on the failure of the former surface owners to expressly transfer such rights."  *Id.* at 27.  CBC Holdings sought a declaration that Dynatec was

21

legally entitled to remove coal under the lease from New Gauley, but not to extract coalbed methane.  CBC also sought an adjudication of subsurface trespass, and an accounting of the coalbed methane that had been produced and marketed.

Dynatec moved to dismiss the complaint, on the basis that the claims fell within the administrative procedures set forth in the West Virginia Coalbed Methane Act.  The trial court sent the matter to the West Virginia Division of Gas and Oil, to rule on the ownership of the coalbed methane.  CBC Holdings appealed, and the Supreme Court reversed, holding that:

> While this statutory provision acknowledges the potential for disagreement regarding the ownership of coalbed methane, the Act does not seek to provide any basis for resolving conflicts of ownership when they occur.  In *Energy Development Corp. v. Moss*, 214 W.Va. 577, 591 S.E.2d 135 (2003), we observed that "the [Coalbed Methane] statute completely avoids and eschews any attempt at deciding ownership of coalbed methane."  *Id*. at 594, 591 S.E.2d at 152 (emphasis supplied).  . . .
>
> In view of the clear decision of the Legislature to circumvent the issue of coalbed methane ownership, which is the gravamen of Appellant's complaint, giving the Division an additional opportunity to essentially affirm that Dynatec produced the necessary documentation required under the Act for issuing coalbed methane permits seems ill-advised. In our opinion, referring this matter to the Division will not assist the trial court in making a decision regarding who owns the subject mineral rights because the provisions of the Act make clear that the West Virginia Division of Oil and Gas does not have the authority to resolve issues of conflicting ownership claims to coalbed methane.
>
> The Legislature was clear in its designation of the Division's regulatory responsibilities. Noticeably absent from those delineated powers is authority to interpret mineral rights and leasehold ownership issues.

*CBC Holdings*, 224 W.Va. at 30-31, 680 S.E.2d at 45-46.

*CBC Holdings* is directly on point in this case.  Sections 45.1-361.14 and 15 of the Act set out the powers of the Board. The Act – like its West Virginia equivalent – does not permit the Board to make gas ownership determinations. Further, nothing in the Act or the Board's

Regulations grants the Board the authority to hear, much less grant, Plaintiff's claims for relief. Notably, EQT does not argue otherwise.

Even if the Board were somehow able to hear Plaintiff's claims, which it is not, Plaintiff would still be able to maintain the present claims in this Court. As one court held:

> Although as a general rule a court lacks jurisdiction where the plaintiff fails to follow the required statutory procedure, there are some situations in which a court may entertain a petition seeking judicial relief by a method other than that prescribed by statute. **Where an appeal to an administrative agency would not provide a party with adequate relief, a challenge may be properly made by commencing an action for declaratory relief.**

*Jackson County Iron Co. v. Musolf*, 134 Wis.2d 95, 96 N.W.2d 323, 325 (1986) (emphasis added) (citations omitted). Petitioning the Board over ownership and damages is a petition that applicable law simply does not require Plaintiff to make.

Second, the Act <u>requires</u> the present lawsuit for Plaintiff to determine ownership and the resultant proceeds owed him. EQT represented to the Board that there was a conflicting interest to Plaintiff's CBM interest.  Because of EQT's representation, the Board was required by the Act to order EQT to create an escrow account to hold, *inter alia*, the proceeds attributable to the conflicting claims. These conflicting claims can only be resolved by "a court of competent jurisdiction."  VA. CODE ANN. §45.1-361.22(5). Further, the Act specifically states that the proceeds from the escrow account can be distributed <u>only after a court</u> has reached a final decision of ownership. VA. CODE ANN. § 451.361.22(5) (emphasis added). Thus, a final decision from this Court is required before any monies can be distributed from the escrow account.

Third, EQT can point to no language in the Act that would reserve to the Board exclusive jurisdiction to hear common law claims such as Plaintiff's. This is because there is none. Absent an intent by the General Assembly to have the Board – as opposed to a court – decide all issues related to the escrow account, this Court is not divested of jurisdiction over Plaintiff's claims.

*See Kingwood Oil Co. v. Hall-Jones Oil Corp*., 1964 Okla. 231, 396 P.2d 510, 513 (Okla. 1964) (finding that Oklahoma's equivalent of Virginia's Oil and Gas Board was without jurisdiction to hear Plaintiff's tort claims regarding well).

No court has addressed this precise issue in the context of the Act. However, in a case involving the Virginia Beer Franchise Act, and an argument identical to EQT's, a sister court overruled defendant's objections and found that it had jurisdiction to hear the plaintiff's common law claims. *Virginia Imports, Inc. v. Kirin Brewery of Am., LLC*, 296 F. Supp. 2d 691, 697-98 (E.D. Va. 2003) (finding that Virginia Beer Franchise Act does not contain language forbidding plaintiff's common law fraud claim and declining to find applicable the doctrine of primary jurisdiction). EQT cites no support for the proposition that because the Board <u>may</u> have the authority to handle <u>some</u> issues related to the escrow account that the Board <u>must</u> hear <u>all</u> claims related to the escrow account. There is no such authority and this Court has jurisdiction over Plaintiff's claims.

Fourth, one of the bases for this Court's jurisdiction is 28 U.S.C. § 2201(a), which provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Section 2202 further supports Plaintiff's position that this Court may grant Plaintiff relief. "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C § 2201. Therefore, even if the Board could fashion some remedy for Plaintiff's claims (which it cannot), this fact would not divest this Court of jurisdiction or militate in favor of the Court abstaining from hearing the case. *See also, Clayton v. Swift*, 132 F. Supp. 154, 156 (E.D. Va. 1955) ("it is fundamental that the existence of another

24

adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate under Rule 57 of the Federal Rules of Civil Procedure").

  **E.**  **The Constitutionality of the Act.**

  If the Court applies the plain language of the Act (*see* Amended Complaint ¶¶44-68), then the Act is being applied constitutionally, and the Court need not reach Plaintiff's unconstitutionality allegations.  (Amended Complaint ¶¶69-92)  However, if the Court were to agree with EQT's interpretation of the Act, including, *inter alia*, the allowance of a permanent deemed lease of 1/8th that remains in place for the life of the well (Brief at 13), then the deemed lease provisions of the Act (§45.1-361.22(6)) constitute a taking of Plaintiff's property rights for private purposes under State authority, in violation of the Fifth Amendment to the United States Constitution, and in violation of Article I, Section 11, of the Virginia Constitution; or, alternatively, constitute a taking of Plaintiff's property rights under State authority without adequate or just compensation, in violation of the Fifth Amendment to the United States Constitution and in violation of Article I, Section 11 of the Virginia Constitution. (Amended Complaint at ¶71)

  **1.** **Unconstitutional Taking for Private Purposes.**

  Plaintiff first alternatively asserts that the "deemed lease" provisions of §45.1-361.22(6) of the Act, as interpreted/applied by EQT, are not necessary for the pooling of an unleased mineral owner's interests, are not consistent with the constitutionally permissible purposes of the pooling law, and effect an unconstitutional taking of Plaintiff's <u>private</u> property (i.e., gas interests) for <u>private</u> purposes (i.e., transfer to EQT).

  Specifically, Plaintiff's Amended Complaint states that the "deemed lease" provisions of the Act, as interpreted/applied by EQT, have been "automatically invoked to effect a transfer of the property rights and interests of the unleased mineral owners (Plaintiff and the Class

Members) to another private party (EQT)." (Amended Complaint at ¶77)  As a result, Plaintiff,

"[t]he unleased mineral owner[,] is, thus, divested of [his] CBM ownership interests, which are

transferred to the operator, and is left with only a 1/8th net proceeds royalty interest," *see id.* at

¶78, rather than retaining all (8/8ths) of his interests in the production of CBM well[s] as a non-

operating working interest owner.  *Id.* at ¶86.  Further, one of the attributes of mineral ownership

is the "executive right," which is "the exclusive power to execute oil and gas leases." 2 PATRICK

H. MARTIN AND BRUCE M. KRAMER, WILLIAMS & MEYERS OIL AND GAS LAW §338 (Matthew

Bender 2009).  This property interest includes the right of the mineral owner to lease his interests

to a third party under lease bonus, royalty rate and other terms and conditions acceptable to the

gas owner, in his sole discretion.  Plaintiff contends that the Board's establishment of a *de facto*

standard 1/8th net proceeds royalty rate and meager lease bonuses of $1.00 per acre and $5.00

per acre, has eliminated the ability of unleased mineral owners to negotiate leases with third

parties on terms acceptable to the unleased mineral owners, and the Act has thereby and

otherwise enabled and empowered EQT to deprive Plaintiff and the Class Members of their

executive rights and effectuate a transfer of their gas interests to EQT via the deemed leases.

(Amended Complaint at ¶¶79-81)  Plaintiff therefore contends:

> [I]f the Court were to agree with EQT's interpretation of the Gas
> Act, including, *inter alia*, the allowance of permanent deemed
> leases in forced pooling orders in favor of an operator who has no
> true gas ownership or gas lease rights in the proposed unit, then the
> deemed lease provisions of the Gas Act (§45.1-361.22(6))
> constitute a taking of Plaintiff's property rights for private
> purposes under State authority in violation of the Fifth Amendment
> to the United States Constitution, and in violation of Article I,
> Section II of the Virginia Constitution.

*Id.* at ¶71 (emphasis added).

While EQT argues that "there is no authority in the country supporting Plaintiff's

constitutional claim," (Brief at 21), it is crystal clear that if government-sanctioned taking

deprives a private party of a property interest solely for a private purpose, then the taking

violates the property owner's Fifth Amendment rights. *Hawaii Housing Auth. v. Midkiff*, 467

U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use

requirement; it would serve no legitimate purpose of government and would thus be void.").

Over two centuries ago, just after the *Bill of Rights* was ratified, Justice Chase [of the

United Supreme Court] wrote:

> An Act of the Legislature (for I cannot call it a law) contrary to the
> great first principles of the social compact, cannot be considered a
> rightful exercise of legislative authority . . . . A few instances will
> suffice to explain what I mean . . . [A] law that takes property from
> A and gives it to B: It is against all reason and justice, for a people
> to entrust a Legislature with such powers; and, therefore, it cannot
> be presumed that they have done it.

*Calder v. Bull*, 3 U.S. 386, 388, 3 Dallas 386, 1 L.Ed. 648, 649, 1798 U.S. LEXIS 148 *5-6

(1798).

In *Missouri Pacific Railway Co. v. Nebraska*, 164 U.S. 403 (1896), an association of

farmers and leaseholders applied to and obtained an order from the state board of transportation

requiring a railroad company to grant the farmers the privilege of erecting a grain storage

elevator on station property owned by the railroad. 164 U.S. at 411-13. The railway company did

not comply and a writ of mandamus was sought and obtained from the state supreme court. *Id.* at

413-14. Upon review, the United States Supreme Court reversed the state supreme court, noting:

> The order in question was not, and was not claimed to be . . . a
> taking of private property for a public use under the right of
> eminent domain. The petitioners were merely private  individuals,
> voluntarily associated together for their own benefit.  They do not
> appear to have been incorporated by the State for any public
> purpose whatever; or to have themselves intended to establish an
> elevator for the use of the public.
>                                     * * * * *
> <u>To require the railroad company to grant to the petitioners a
> location on its right of way</u>, for the erection of an elevator for the
> specified purpose of storing from time to time the grain of the
> petitioners and or neighboring farmers, <u>is to compel the railroad</u>

> company, <u>against its will, to transfer an estate in part of the land
> which it owns and holds</u>, under its charter, as its private property
> and for a public use, <u>to an association of private individuals</u>, for the
> purpose of erecting and maintaining a building thereon for storing
> grain <u>for their own benefit</u>, . . . .

164 U.S. at 416-17 (emphasis added).  The *Missouri Pacific* Court determined unanimously that

> [T]he order in question, so far as it required the railroad
> corporation to surrender a part of its land to the petitioners, for the
> purpose of building and maintaining their elevator upon it, was, in
> essence and effect, <u>a taking of private property of the railroad
> corporation, for the private use of the petitioners</u>.

*Id.* at 417 (emphasis added).  The Court held that the taking of private property of one person or corporation for the private use of another is a violation of the Fourteenth Amendment to the United States Constitution. *Id.*

   In *Thompson v. Consolidated Gas Utilities Corp*., 300 U.S. 55 (1937), the United States Supreme Court reviewed challenges to the validity of natural gas proration orders issued by the Texas Railroad Commission for gas fields in the Texas Panhandle (described by the Court as containing the largest natural gas field in the United States).  300 U.S. at 57, 59. Natural gas producers sued to enjoin the Texas Railroad Commission and Attorney General from enforcing the orders as they limited gas produced by all the wells in the Panhandle and prorated the total amount of gas produced in the Panhandle among all the wells.  The plaintiff producers had pipelines from their wells to their markets in other states, while other owners in the field did not. *Id.* at 58.  The proration orders limited production from plaintiffs' wells to an amount below their market requirements under existing contracts, below their present production and below the capacity of their transportation and marketing facilities. *Id*. The producers argued that the orders compelled plaintiffs, and others similarly situated, to purchase gas from those well owners who did not have a market or marketing facilities. *Id.* The effect of the orders was to require the producers to buy gas from other well owners in order for the producers to meet their contract

obligations. Thus, they sued to enjoin the orders and the district court entered a decree in their favor.

On appeal, the Supreme Court noted that the sole purpose of the orders' limitation imposed on plaintiffs' production was to compel those who may legally produce -- because they had market outlets for permitted uses -- to purchase gas from potential producers whom the statute prohibits from producing because they lacked such a market for their possible product. *Id.* at 77. The Commission orders compelled producers to share their private marketing contracts and to use their pipelines and other facilities for transmitting their gas to market with other owners who were not connected to pipelines; "[i]n short to compel complainants to afford markets to those having none." *Id.* at 77-78.

The *Thompson* Court noted:

> The use of the pipeline owner's wells and reserves is curtailed solely for the benefit of other private well owners. The pipeline owner, a private person, is, in effect, ordered to pay money to another private well owner for the purchase of gas which there is no wish to buy.
>
> * * * * *
>
> Under each statute [and orders issued thereunder], if obeyed, the State takes from the pipeline owner the money with which the purchase is made, the money lost through curtailed use of properties developed at large expense, the money lost because of the drainage away from his land of the gas which he is forbidden to produce for himself, but must buy from those towards whose lands it migrates.

*Id.* at 78-79.

Justice Brandeis, writing for the Court in affirmance of the lower court ruling enjoining enforcement of the orders, observed: "Our law reports no more glaring instance of the taking of one man's property and giving it to another." *Id.* at 79. The *Thompson* Court recognized that "this Court has many times warned that one person's property may not be taken for the benefit of

another private person without a justifying public purpose, even though compensation be paid." *Id.* at 80.

Plaintiff states no "<u>public</u> taking" claims in this case against any governmental entity, nor has any governmental party taken Plaintiff's property for a public purpose. However, EQT improperly mischaracterizes Plaintiff's action as involving "inverse condemnation" claims, which by their inherent nature would only be asserted against the Commonwealth of Virginia or an agency thereof. (Brief at 25)  EQT conclusorily recasts Plaintiff's <u>private</u> taking claims as inverse condemnation claims for strategic reasons to fabricate the argument that a federal court cannot consider such claims until Plaintiff exhausts his statutory remedies in state court.[7] EQT's unilateral reinvention of Plaintiff's claims as concerning inverse condemnation is misleading, its reliance on *Williamson County* (a suit for governmental taking by county planning commission) is entirely misplaced, and its "failure to exhaust" inverse condemnation remedies has no merit.

In the instant matter, there are no governmental defendants and no public takings or inverse condemnation claims.  Moreover, EQT does not even address Plaintiff's private taking claims stemming from EQT's use of the Act's "deemed lease" provisions to effect a permanent improper and unconstitutional transfer of Plaintiff's private CBM rights and interests to another private entity, EQT, for its sole benefit. The logic of *Calder*, *Missouri Pacific* and *Thompson* supports a ruling from this Court that the "deemed lease" provisions of the statute are

---

[7] Plaintiff's action does not include as defendants the Commonwealth of Virginia, the Board, or any other governmental agency or entity, an essential fundamental element of an inverse condemnation action which is obviously missing here. *See, e.g.*, Amended Complaint at ¶72. "[I]nverse condemnation is *a cause of action against a governmental defendant* to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *United States v. Clarke*, 445 U.S. 253, 257 (1980), *quoted in Kitchen v. City of Newport News, Virginia*, 485 F. Supp.2d 691, 693 (E.D. Va. 2007) (emphasis, in italics, in original). Plaintiff's claim is for a private taking by transfer from one private person to another and there are no governmental defendants. Thus, these authorities and *Williamson County* are inapposite and wholly irrelevant.

unconstitutional and void *ab initio*, thus entitling Plaintiff and the Class Members to the declaratory and monetary relief requested in the Amended Complaint.

Plaintiff's Amended Complaint pleads facts adequately establishing that the deemed lease provisions – as interpreted/applied by EQT – constitute an unconstitutional taking for private purposes.  (Amended Complaint ¶¶72-87)  EQT has not challenged those factual allegations but has instead resorted to reliance on cases that are distinguishable and that do not involve or address facts and arguments of the type presented here by Plaintiff.

For example, in the cases EQT cites from South Dakota, Utah, and New York (Brief at 23), the issue was whether the board issuing compulsory pooling orders had the authority to impose risk penalties on mineral owners.  *See In re Kohlman*, 263 N.W.2d 674 (S.D. 1978); *Bennion v. ANR Prod. Co.*, 819 P.2d 343 (Utah 1991); *W. Land Servs., Inc. v. Dep't of Envtl. Conservation of N.Y.*, 804 N.Y.S.2d 465 (N.Y. App. Div. 2005).  Further, of those three opinions, only *Bennion* involved a constitutional argument.  819 P.2d at 347-51.  Plaintiff does not challenge *Bennion*'s conclusion that risk penalties imposed on working interest owners, including unleased mineral owners, are constitutional.  However, the deemed leases at issue in the instant action are not risk penalties and are not discussed in this case law.

The case of *Hunter v. Justice's Court of Centinela Township*, 223 P.2d 465 (Cal. 1950), cited by EQT (Brief at 23), is also distinguishable.  In *Hunter*, the plaintiff challenged California's compulsory pooling regulations on the grounds that they violated the due process and equal protection clauses of the Fourteenth Amendment.  *Id.* at 466.  The regulation at issue, however, did not force a lease with one-eighth royalties on an owner who did not select another available option, but instead guaranteed the owner a minimum royalty of one eighth should he choose the lease option and anticipated that the owner and the operator would negotiate terms at market rates.  *Id.* at 468.

In *Anderson v. Corporation Comm.,* 327 P.2d 699, 700-04 (Okla. 1957), (Brief at 23), the Supreme Court of Oklahoma was not faced with the constitutional issue specifically presented here.  There, the Corporation Commission of Oklahoma ordered Anderson to elect between accepting what it determined to be the reasonable bonus value per acre or to elect to participate in the working interest of the oil well.  *Id.* at 701.  The court said explicitly in its opinion that it "need not consider the reasonableness of the order since Anderson's contention goes solely to the authority of the Commission to make it."  *Id.* at 701-02.  Therefore, the court held only that the Commission did have the authority under Oklahoma law to enter the subject order and did not reach any question of reasonableness or of whether the imposition of a deemed lease constitutes an unconstitutional taking.

The Kansas case cited by EQT is also inapplicable.  *Marrs v. City of Oxford*, 24 F.2d 541 (D. Kan. 1928).  In *Marrs*, the court considered the reasonableness of a city ordinance that allowed oil owners in the 1920's to elect between participating in the drilling process or entering into a one-eighth royalty lease with the operator.  *Id.* at 552.  After determining that forced pooling generally is constitutional (which Plaintiff in this action does not dispute), the court cursorily stated that, since "counsel for plaintiffs have not advised the court of any fairer method of handling the situation," it would find that use of the "usual royalty of one eighth" is reasonable.  *Id.*  In this matter, Plaintiff has demonstrated both the fair, just, and constitutional alternatives available to the Commonwealth of Virginia and how the current provisions -- as interpreted by EQT -- violate the Takings Clause.  *See* Amended Complaint ¶¶72-87.[8]

_____

[8] A mineral interest owner has the right to "take in kind" and sell his ownership share of gas or oil produced from a unit/well.  A statute effectuates an unconstitutional taking of private property if the statute deprives the mineral interest owner of such a right by, *inter alia*, empowering one interest owner to take an undue portion of a unit's/well's production to the detriment of another interest owner.  *See, e.g., Sindell v. Smutz,* 222 P.2d 903, 907 (Cal. App. 1950) (citing *Ohio Oil Co. v. Indiana*, 177 U.S. 190 (1900) and *Gulf Land Co. v. Atlantic Refining Co.*, 131 S.W.2d 73 (Tex. 1939)).  The effect of the Act's "deemed lease" provision -- as interpreted/applied by EQT -- would be to unconstitutionally take Plaintiff's and the Class Members' correlative rights, i.e., their right to take their ownership share of CBM in kind, and

EQT argues that there has been no taking because an unleased mineral owner could have elected to retain a working interest in the well, on either a "participating" or "non-participating" (carried) basis, and that the deemed lease was imposed because the gas owner did not elect any of the other options that were made available to him. (Brief at 22)  EQT's argument disregards Plaintiff's allegation establishing that the Act, as written and/or as applied/manipulated by EQT, does not provide Plaintiff and the Class Members with any meaningful options or election opportunities. (Amended Complaint at ¶¶76-83).[9]  In view of these factual allegations -- which must be taken as true -- the argument advanced by EQT has no merit and the various cases cited by EQT are factually distinguishable and, therefore, inapplicable.

EQT asserts that the "deemed lease" provision is simply an "exercise of the [Commonwealth's] police power."  (Brief at 24)  Such an analysis is nothing more than self-serving "spin."  The "private takings" claim in this case is not about "police powers" being

transfer such rights to EQT, thereby enabling EQT to confiscate Plaintiff's and the Class Members' rights and enabling EQT to take in kind Plaintiff's and Class Members' CBM for EQT's own use and benefit. To be constitutional, a compulsory or forced pooling statute should only -- and need only -- "pool"  the unleased mineral owners' rights and interests in the Unit and provide that if an unleased mineral owner does not elect to participate, then he will be treated as a non-participating ("carried") working interest owner. The "pooled" unleased mineral owner would thereby retain all (8/8ths) of his or her interests share in the production of CBM well as a non-operating working interest owner, and bear his or her proportionate share of operating costs on a non-participating ("carried") basis. The Act's  "deemed lease" provisions, however, go too far; it is not necessary for the pooling of an unleased mineral owners' interests, is not consistent with the constitutionally permissible purposes of the pooling law, and effects a taking of private property from the unleased mineral owner  and the transfer of that private property to another private person, for the benefit of that other private person (the operator), in violation of the United States and Virginia Constitutions.  *See* Amended Complaint at ¶¶84-87.

[9] Statutes may be facially constitutional yet unconstitutionally applied.  "Our cases further establish that a statute or a rule may be held constitutionally invalid **as applied** when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question."  *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (citations omitted) (emphasis added).  *See South Carolina v. Katzenbach*, 383 U.S. 301, 309, 328, 329-30, 334 (1966) (Supreme Court sustained federal statute that categorically prohibited certain states from imposing voting literacy requirements, even though Court had upheld facial constitutionality of such literary tests reasoning that such tests could be applied in a racially unconstitutional manner in many circumstances); *Texas v. Johnson,*491 U.S. 397, 402 (1989) (affirming reversal of conviction on basis that statute was unconstitutional as applied as opposed to finding statute facially unconstitutional).

exercised to secure the public safety, health or morals.  Nor is it about "the common good," as

EQT asserts.  Instead, Plaintiff's claim is about CBM production and sales proceeds being taken

from the pockets of certain private citizens and being dropped into the pocket of another private

citizen, EQT.  It is about the taking of private property rights for private purposes under State

authority -- an action that unequivocally violates the affected property owners' constitutional

rights.

Finally, EQT cites an oil and gas treatise for the proposition that "[t]he constitutionality

of compulsory pooling statutes has been sustained so generally that no reasonable question on

this score remains." (Brief at 25) EQT's citation is a red herring.  Plaintiff does not challenge the

compulsory pooling of gas interests. (Amended Complaint ¶72) The pending issue has to do,

instead, with the ownership of gas interests within a unit created through compulsory pooling.

Under the deemed lease provisions as EQT seeks to apply them, the unleased mineral owner is

divested of its CBM ownership interests which are transferred to the operator, a private

company, and is left with only a 1/8th net proceeds royalty interest, under a scheme that, as

written and/or applied, enables operators such as EQT to effectuate a transfer of property rights

to themselves, for their private benefit, and also enables them to procure such deemed leases

improperly. (Amended Complaint ¶¶77-87) Such transfers of property rights simply do not relate

to nor advance any legitimate State interest or the purposes, goals, and objectives of the pooling

laws -- and EQT has not presented any facts or arguments to the contrary.

### 2.  Unconstitutional Compensation.

As an additional alternative claim, Plaintiff asserts that the deemed lease provisions are

unconstitutional because they are based on compensation that is inadequate and unjust.

(Amended Complaint ¶88)  *See generally Almota Farmers Elevator & Warehouse Co. v. United

States,* 409 U.S. 470, 473-74 (1973) ("Fifth Amendment [to the United States Constitution]

provides that private property shall not be taken for public use without just compensation: 'And "just compensation" means the full monetary equivalent of the property taken . . . . [T]he owner is entitled to the fair market value of his property at the time of taking.'" (citations omitted)); *Lynch v. Commonwealth Trans. Comm'r*,  247 Va. 388, 391, 442 S.E.2d 388, 389 (1994) ("The measure of compensation for the property taken is the fair market value of the property at the time of the taking.").

The following facts must be taken as true for the purposes of evaluating the viability of this claim:

> EQT's CBM wells are extremely low-risk (no-risk) operations, given that the wells are drilled at relatively shallow depths into coal seams that are known to contain substantial quantities of commercially recoverable CBM. In such circumstances, the deemed lease royalty terms (1/8th net proceeds royalty and paltry cash bonuses of $1.00 per acre and $5.00 per acre) are materially and substantially less than the royalty terms and provision that could be obtained by unleased mineral owners through the negotiation of a gas lease in a free, open, and competitive market, and do not represent fair market value for the Plaintiff's and the Class Members' property interests.

(Amended Complaint ¶89)  EQT ignores this claim, and Plaintiff must be allowed to pursue it.

## F.    Count I States a Claim for a Declaratory Judgment.

Plaintiff seeks a declaratory judgment resolving the subject ownership claims in favor of Plaintiff and the Class Members, and resolving the accounting issues that will necessarily flow from that determination.  This is exactly what the Act requires:  "The Board shall order payment of principal and accrued interest, less escrow account fees, from the escrow account to conflicting claimants only after (i) a final decision of a court of competent jurisdiction adjudicating the ownership of coalbed methane gas as between them . . . ."  VA. CODE ANN. §45.1-361.22(5).

EQT's delay tactic of opposing this statutorily-required request (Amended Complaint ¶109(a)) on the basis of a supposed failure to name indispensable parties (Brief at 25-26) belies EQT's true intention – to never have to account to Plaintiff and Class Members for what it has (and has not) paid into escrow.  Using this same argument, EQT further opposes Plaintiff's request for a declaratory judgment that (1) the CBM leases EQT entered with Coal Owner Defendants are void and of no force (Amended Complaint ¶109(b)) and (2) all proceeds attributable to Plaintiff and Class Members must be released from escrow (*id.* at ¶109(d)).  For brevity's sake, Plaintiff references his previous argument on these points at Section III(A), above.

Plaintiff also seeks a declaration that EQT must account to Plaintiff as an unleased mineral owner on an eight/eighths basis, net of operational expenses. (Amended Complaint ¶109(c)). EQT argues that Plaintiff fails to state a claim (Brief at 26), but EQT's argument is refuted in Section III(B), above.

Asserting that Plaintiff failed to exhaust his administrative remedies, EQT (Brief at 26-27) opposes Plaintiff's request for a declaratory judgment that EQT must account for the methodology it used to calculate the escrowed proceeds.  (Amended Complaint ¶109(e)). This argument is refuted in Section III(D), above.

Plaintiff seeks a declaratory judgment that the Act is unconstitutional if, and only if, EQT's interpretation of the Act is correct. (Amended Complaint ¶109(f)).  EQT argues that Plaintiff fails to state a claim for this relief (Brief at 28), but EQT's argument is refuted by Plaintiff in Section III(E), above.

### G.    Count II States a Claim for Trespass.

For at least 150 years, Virginia has recognized the tort of trespass in the context of mineral rights. *Warwick & Barksdale v. Mayo*, 56 Va. 528, 546 (1860) ("amongst the rights of

the [mineral] owner is the right to maintain trespass"). A tortfeasor may commit trespass in one

of two ways. He commits trespass if he (1) enters onto the land of another without authorization

or (2) uses the property in an unauthorized manner. *Jaynes v. Com.*, 276 Va. 443, 459 (2008)

("Trespass is the unauthorized use of or entry onto another's property."). The "unlawful entry

onto" prong is not at issue in this case. Plaintiff's claim concerns EQT's unauthorized use of

Plaintiff's and Class Members' property, namely, their gas interests and/or CBM production.

EQT, as the Board-appointed operator of the CBM Units, had the lawful authority to

produce the CBM that was attributable to Plaintiff's and the Class Members' interests, but once

the CBM was produced, EQT was obligated to deliver the CBM to the rightful owners. Plaintiff

alleges that EQT exercised wrongful dominion and control over the CBM that was attributable to

Plaintiff's and the Class Members' interests, and deprived Plaintiff and the Class Members of

such CBM and/or production revenues by claiming that the Coal Owner Defendants own the

CBM as a result of their coal ownership interests and/or that EQT had the right to receive and

sell the CBM as the Coal Owner Defendants' lessee. (Amended Complaint at ¶¶111-13)

The subject pooling orders offer EQT no relief. (Brief at 28) The pooling orders do not

authorize EQT to sell Plaintiff's and Class Members' CBM and retain the resulting sales

proceeds for its own use and benefit in a manner inconsistent with the Act, which is the very

conduct complained of herein.

The actions by EQT constitute actionable trespass.  Further, such actions constitute

willful, bad faith trespass as to, *inter alia*, such actions taken by EQT after March 5, 2004, when

the Virginia Supreme Court issued its decision in *Ratliff*.  *See generally Wood v. Weaver*, 121

Va. 250, 92 S.E. 1001, 1004 (1917) (recognizing trespass can be "in bad faith" or "not in good

faith").

**H.    Count III States a Claim for Conversion.**

EQT contends that the tort of conversion applies only to personal property, and that this case relates to real property only. (Brief at 28) EQT is wrong.

Conversion is "any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." *Simmons v. Miller*, 261 Va. 561, 582, 544 S.E.2d 666, 679 (2001). *See also PGI, Inc. v. Rathe Prods., Inc.*, 576 S.E.2d 438, 443 (2003) (any wrongful exercise over another's goods, including sums of money, in denial of lawful owner's rights states claim for conversion); *Economopoulos v. Kolaitis*, 259 Va. 806, 528 S.E.2d 714, 719 (2000).

Plaintiff's conversion claims relate to two types of personal property: (1) gas (CBM) that has been produced, and (2) money (CBM sales proceeds).

Plaintiff first contends that EQT converted CBM that had been produced and that EQT did so by selling and using the CBM for its own account. (Amended Complaint ¶117) "Clearly, when oil and gas has been produced, it is personal property."  HOWARD R. WILLIAMS AND CHARLES J. MEYERS, OIL AND GAS LAW § 212 (3rd Ed. 2007).  *See also United States v. Tex. Eastern Trans. Corp.*, 254 F. Supp. 114, 118 (W.D. La. 1965) (oil or gas became personalty when produced); *Halliburton Oil Producing Co. v. Grothaus*, 981 P.2d 1244, 1251 (Okla. 1998) (judgment lien attaches only to realty and thus cannot be enforced against oil and gas that has been severed from the ground); *Merrill Engineering Co. v. Capital National Bank of Jackson*, 5 So.2d 666, 670 (Miss. 1942) (adopting the well-settled rule of other jurisdictions that oil and gas constitute an interest in real estate, "until brought to the surface and reduced to possession" whereby it converts to personal property).

Plaintiff also contends that EQT converted money and that EQT did so by retaining CBM sales proceeds for its own account. (Amended Complaint ¶¶62-65, 117) This is actionable conversion as well. *See PGI, Inc., supra* (wrongful exercise over sums of money in denial of

lawful owner's rights constitutes conversion).

## I.      Counts IV and V State Claims for Negligence.

Plaintiff brings two claims for negligence against EQT: negligence in performing a voluntary undertaking (Count IV) and negligence in performing its duties as the well operator (Count V).  EQT asserts that "[a]ny duty of EQT arises solely under the Gas and Oil Act of the pooling orders, and EQT is not liable for common law negligence." (Brief at 29) Wrong.  While the Act and the pooling orders imposed duties on EQT, common law duties were also imposed on EQT, including duties arising out of EQT's undertakings.

### 1.      Count IV.

Plaintiff alleges in Count IV (Amended Complaint ¶¶120-125) that EQT voluntarily undertook to submit applications to the Board for the creation of CBM Units and thereby also voluntarily undertook the tasks of identifying the persons and entities owning an interest in the proposed units and identifying any conflicting CBM ownership claims therein.  EQT recognized, or should have recognized, that the proper identification of owners and ownership interests was necessary for the protection of those persons and entities actually owning interests in the CBM that was going to be produced from the CBM Unit.  As a matter of law, EQT's voluntary undertaking imposed upon EQT a duty to exercise reasonable care in the discharge of its undertaking. *See*, *e.g.*, *Kellermann v. McDonough*, 278 Va. 478, 684 S.E.2d 786, 790-91 (2009) (adults who voluntarily undertook to supervise minor had owed duty for minor's safety).

Virginia recognizes the "ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Didato v. Strehler*, 262 Va. 617, 628, 554 S.E.2d 42, 48 (2001) (quoting *Nolde Bros. v. Wray*, 221 Va. 25, 28, 266 S.E.2d 882, 884 (1980)). In *Didato*, the Court observed that this "common law principle" is embodied in §323 of the RESTATEMENT (SECOND) OF TORTS:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm or (b) the harm is suffered because of the other's reliance upon the undertaking.

*Didato*, 585 S.E.2d at 48. *See* RESTATEMENT (SECOND) OF TORTS §304 ("A misrepresentation of fact or law may be negligent conduct."); RESTATEMENT (SECOND) OF TORTS §552 (information negligently supplied for the guidance of others). *See also* 37 AM. JUR. 2D *Fraud and Deceit* §209 ("In general, once a person undertakes to speak, that person assumes a duty to tell the whole truth, and to make a full and fair disclosure as to the matters about which the person assumes to speak. Under the law of fraudulent concealment or suppression, a duty to disclose may exist where one voluntarily undertakes to speak but fails to prevent his or her words from being misleading . . . . A party who makes a statement which at the time is true, but who subsequently acquires new information that makes it untrue or misleading, must disclose such information to anyone whom the party knows to be acting on the basis of the original statement or be guilty of fraud."(footnotes omitted)).

The existence of a common law duty is also warranted under the type of analysis described in *Jappell v. American Ass'n of Blood Banks*, 162 F. Supp.2d 476 (E.D. Va. 2001). In *Jappell*, the Court applied Virginia law and recognized that: "Duty is not an abstract concept but is always tied to a particular individual or class of persons to which an individual belongs. In determining whether a duty exists, the Court considers factors including foreseeability of harm, the likelihood of injury, the magnitude of the burden of guarding against that injury, and the consequences of placing such a burden on the defendant." *Id*. at 480 (citations omitted). The Court applied such an analysis to the facts before it and concluded: "When defendant undertook to ensure the safety of the nation's blood supply by issuing standards, it took on a duty to transfusion recipients to ensure those standards were drafted without negligence." *Id*. at 481.

In this case, EQT undertook to identify CBM owners and conflicting CBM ownership claims.  It was foreseeable that the persons and entities actually owning interests in the CBM (the Class Members) could be harmed if EQT failed to correctly identify the owners and/or conflicting ownership claims; there was a likelihood of injury to the true owners if conflicting claims were improperly identified by EQT; and guarding against that injury was a burden undertaken by EQT. Thus, under the reasoning of *Jappell*, when EQT undertook to identify the CBM owners and/or conflicting CBM ownership claims, EQT had a legal duty to the Class Members to ensure that the ownership and conflicting claims lists "were drafted without negligence." *See id.* at 481. *Cf. O'Connor v. First National Investors' Corp. of Virginia*, 163 Va. 908, 919, 177 S.E. 852, 857 (1935) (directors of corporations "impliedly undertake to use as much diligence and care as the proper performance of the duties of their office requires").

EQT claims Plaintiff should have exhausted his alleged administrative remedies (Brief at 29) but this is refuted in Section III(D), above.  EQT also claims Plaintiff does not have standing to bring claims for Class Members whose interests were identified by EQT as being subject to "conflicting claims" after the *Ratliff* decision. (Brief at 29) In fact, Plaintiff does have standing to assert pre- and post-*Ratliff* claims, with the only relevant consideration in this context being that EQT is charged with greater knowledge of the true rights of CBM owners post-*Ratliff*, thereby making its actions all the more egregious.

### 2.   Count V.

Plaintiff's claim in Count V alleges that EQT owed Plaintiff and Class Members certain obligations resulting from implied covenants and duties, including the duty to market and the duty to act as a reasonably prudent operator. (Amended Complaint at ¶ 127).  EQT does not focus on these alleged breaches, and with good reason.  While the deemed leases were in place, EQT's status as a lessee carried with it certain legal duties which are well established in oil and

gas jurisprudence.  *See* WILLIAMS & MEYERS OIL AND GAS LAW §802.1 ("In the development of oil and gas law in the United States, it has come to be recognized in all producing states that a lessee is subject to certain implied duties to the lessor . . . .").[10]  The implied duties of an operator under an oil and gas lease are well-established, and EQT could not reasonably argue that these implied duties do not exist or that it is not bound by them.

One implied duty is to "operate diligently and prudently."  *Garman v. Conoco*, *Inc.*, 886 P.2d 652, 659 (Colo. 1994).  "'Embodied in the duty to operate diligently and prudently is the implied covenant to market.'"  *Id.* (quoting *Davis v. Cramer,* 808 P.2d 358 (Colo. 1991)).  *See also Gilmore v. Superior Oil Co.*, 192 Kan. 388, 392, 388 P.2d 602, 606 (1964) (where reasonable diligence to market "is not expressed in the lease, it is generally implied"); WILLIAMS & MEYERS, OIL AND GAS LAW §853 at 390 ("Upon discovery of minerals on a leasehold, the lessee is ordinarily under an implied duty to market the product.").

---

[10]  Implied covenants in oil and gas leases obligating the lessee have been recognized for many decades.  One commentator (who is in-house counsel for a major oil company (Exxon)) has observed the following with regard to implied covenants in oil and gas leases:

> The implied covenants cover many aspects of a lessee's operations under an oil and gas lease.  While numerous systems of classifying the covenants [have] been suggested over the years, the following list of implied covenants, proposed by Professor Richard Hemingway, is the most generally accepted:
>
> 1.      The implied covenant to develop the lease ...;
>
> 2.      The implied covenant to protect the lease …; and
>
> 3.      The implied covenant to manage or administer the lease which includes the covenants to: (a) produce, and market production, and (b) operate the lease with reasonable care . . . .
>
> Until recently, the implied covenant to market received less attention than most of the other implied covenants.  The covenant, however, has always been recognized.

S. Lansdown, *The Implied Marketing Covenant in Oil and Gas Leases: The Producer's Perspective*, 31 ST. MARY'S L.J. 297, 302-04 (2000) (footnotes omitted).

The standard of care in which lessees are expected to carry out its implied duties is "that of a reasonably prudent operator under the same or similar facts and circumstances." *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567-68 (Tex. 1981) (citations omitted); *see also Smith v. Amoco Prod. Co.*, 272 Kan. 58, 31 P.3d 255, 272 (Kan. 2001) (noting that "[u]nder the reasonably prudent operator standard, Amoco must not only consider its own economic interest but also take into account the interest of [the lessor]"); *Southwest Gas Producing Co. v. Seale*, 191 So.2d 115, 119-20 (Miss. 1966) (recognizing that "the great majority of jurisdictions . . . apply the 'prudent operator' standard" and describing the standard as "Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interest of both lessor and lessee, in what is required.").

Implied duties are consistently recognized as arising out of gas leases in virtually all jurisdictions, and those duties should be recognized and enforced here.

### J.   Count VI States a Claim for Breach of Fiduciary Duties.

EQT contends that it owed no fiduciary duties. (Brief at 30)[11]  EQT is wrong.

A fiduciary relationship exists where "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *H-B Ltd. P'ship v. Wimmer*, 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979) (finding that a real estate agent has a fiduciary duty to his principal by virtue of their special relationship that required the agent to hold title of property in trust for principal

---

[11] The issue of whether there is a fiduciary relationship is a question of fact. *Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 611 S.E.2d 600 (2005); *see also Cafritz v. Corporation Audit Co.*, No. 23005, 1945 U.S. Dist. LEXIS 2251, at **10-11 (D.D.C. May 14, 1945), *aff'd in part, rev'd in part on other grounds*, 156 F.2d 839 (D.C.Cir. 1946) (citing Pomeroy, *Equity Jurisprudence*, Sec. 956. "Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new instances might be excluded.  It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other.  The relation and the duties involved may be moral, social, domestic, or merely personal."). This issue should be decided by the trier of fact, and not on a motion to dismiss.  At the very least, Plaintiff should be given the opportunity to conduct discovery on this issue.

where the principal instructed the agent to purchase it on his behalf); *see also* RESTATEMENT

(SECOND) OF TORT*S* § 874 (1979)  ("A fiduciary relation exists between two persons when one of

them is under a duty to act for . . . the benefit of another upon matters within the scope of the

relationship.")

Fiduciary duties were owed by EQT on several different bases. First, fiduciary duties

were imposed based on EQT's status as the Board-appointed operator of the CBM Units created

through compulsory pooling and/or based on EQT's control over and handling as unit operator of

CBM production and sales proceeds for the benefit of persons owning interests in the CBM

Units operated by EQT.  "Many cases do hold that the unit operator, that is, the manager of the

unitized field, is the fiduciary of the owners of the field*." Finley v. Marathon Oil Co.*, 75 F.3d

1225, 1229 (7th Cir. 1996), citing *Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1487 (10th Cir. 1995);

*Leck v. Continental Oil Co.*, 971 F.2d 604, 607 (10th Cir. 1992); and *Young v. West Edmond

Hunton Lime Unit*, 275 P.2d 304, 308-09 (Okla. 1954).[12]  The *Finley* Court explained that

"[u]nitization makes the owners of the rights in the unitized field joint venturers, and joint

venturers owe a fiduciary duty to each other."  *Id.* Virginia case law also recognizes that joint

venturers owe a fiduciary duty to each other. *Burruss v. Green Auction & Realty Co., Inc*., 319

S.E.2d 725 (Va. 1984).

The *Young* case cited by *Finley* also concluded that an operator owes fiduciary duties to

the unit owners, but analogized the relationship in terms of a trust relationship rather than a joint

venture. *Young* held that when there is pooling, "the unit organization with its operator stands in

a position similar to that of a trustee for all who are interested in the oil production either as

---

[12] Although "unitization" was the word used in *Finley* to describe the relationship among the
landowners and the operator, it is simply another word for pooling, in that it "refers to the exploitation of
an oil and gas field that lies under the surface of a number of landowners as if it were joint ownership, in
order to optimize the rate, and minimize the cost, of production," and to eliminate the landowners'
incentive to drain as much oil as possible from their land, pulling it from under the ground of an adjacent
landowner. 75 F.3d at 1229.

lessees or royalty owners." *Young*, 275 P.2d at 309. In that situation, the trustee has an obligation for "the faithful discharge of the duty which is owing in a fiduciary capacity." *Id*. (quoting *Magruder v. Drury*, 235 U.S. 106 (1914)). Based on this duty, *Young* specifically found that the well operator had a fiduciary duty "to account to all the owners of oil rights within the unit area for their respective portions or percentages of the unit production at the highest market price available at the time of such production under the circumstances." 275 P.2d at 310.[13]

While Plaintiff has located no Virginia case directly on point, the conclusions of *Finley* and *Young* are completely consistent with *H-B Ltd. P'ship*, which holds that a fiduciary relationship exists where "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence."

Second, fiduciary duties were owed by EQT by virtue of EQT's control over and handling, as unit operator, of CBM production and sales proceeds for the benefit of persons owning interests in the CBM Units operated by EQT, including Plaintiff and the Class Members. EQT has undertaken to operate the well, produce the gas, determine the amount of gas produced, market and sell the gas, properly proceeds, properly pay proceeds attributable to conflicting claims into escrow, and render an accounting of same. The continuing operating and accounting services EQT has undertaken to perform for the benefit of Plaintiff are completely and exclusively within the control of the EQT. There is no question that Plaintiff and Class Members

---

[13] *See also Reserve Oil v. Dixon*, 711 F.2d 951, 953 (10th Cir. 1983) (operator of a unitized oil field stands in position of trustee with respect to those interested in oil production, and fiduciary duty is owed by operator to nonoperating owners); *Shearn v. Ward Petroleum Corp.*, 808 F. Supp. 1530, 1532 (W.D. Okla. 1992) (denying motion to dismiss and stating: "What Ward [the operator] overlooked is the clear and abundant case law that holds that a unit operator stands in a fiduciary or trustee-like status as to the interest owners in a well."); *Texas Oil & Gas Corp. v. Hawkins Oil & Gas, Inc*., 668 S.W.2d 16, 17 (Ark. 1984) (fiduciary relationship exists between operator of unit and nonoperators); *Amoco Production Co. v. Wilson*, 976 P.2d 941, 951 (Kan. 1999) (fiduciary duty exists between operator and nonoperator as to area covered by joint operating agreement); *True Oil Co. v. Sinclair Oil Corp*., 771 P.2d 781, 797 (Wyo. 1989) (fiduciary duty relationship exists between operator and nonoperator under unit agreement).

reposed their confidence in EQT that EQT will carry out the operating and accounting duties it agreed to undertake in "good faith and with due regard for their interests." *H-B Ltd. P'ship*, 220 Va. at 179, 257 S.E.2d at 773.  Given EQT's position of superior knowledge and power, the Court should find that a fiduciary relationship exists between EQT and Plaintiff.

In *Gurley v. Lindsley,* 459 F.2d 268 (5th Cir. 1972), the United States Court of Appeals for the Fifth Circuit found that where a property owner was obligated, by virtue of a judgment against him, to pay a debt from royalties he received from an oil and gas lease, the property owner had a <u>fiduciary duty to account</u> for and pay the royalties to satisfy the debt.  *Id*. at 275. The court agreed with the district court's conclusion that, by receiving the income from the land from which they were to pay the royalties, the landowner became a fiduciary to its debtor, with the "'duty and obligation to account to and promptly pay any amounts due and owing to Plaintiffs.'" *Id*.  EQT has an essentially identical fiduciary obligation to Plaintiff, where EQT is obligated to account for and pay proceeds into escrow for Plaintiff's benefit.

Other courts have specifically found that where one party takes on an accounting duty for another, and is entrusted to hold and account for money or property, then a fiduciary relationship exists between the parties.  In *Cafritz v. Corporation Audit Co.,* Civ. No. 23005, 1945 U.S. Dist. LEXIS 2251 (D.D.C. May 14, 1945), the plaintiff employed an audit and accounting company to keep and maintain his books and those of his business.  The plaintiff brought a claim for conversion against the audit company for improperly paying itself and its manager from the plaintiff's account. The court found that, "It is well established that when the defendant is an accounting party, and stands as one occupying a fiduciary relation toward the plaintiff, because of money or property intrusted [sic] the burden is upon him to show that he has performed his trust and the manner of its performance.  He owes this duty because of the confidential relation he bears to his principal, and because he is presumed to know how he has performed." *Id.* at

46

**12.  Likewise here, EQT has duty to account to Plaintiff for the production and/or production proceeds entrusted to it as part of a confidential relationship.  Only EQT knows whether it has accurately performed, and thus EQT's duty to account to Plaintiff is a fiduciary duty.  *Id*.

### K.  Count VII States a Claim for Unjust Enrichment.

EQT contends there is an express contract between the parties and that Plaintiff has an adequate remedy at law that precludes any claim for unjust enrichment. (Brief at 31) EQT's argument is without merit.

To state a cause of action for unjust enrichment, a plaintiff must show that (1) he conferred a benefit on the defendant (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff and (3) the defendant accepted or retained the benefit without paying for its value. *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116, 661 S.E.2d 834, 838 (2008) (citation omitted).

Plaintiff has alleged that he conferred a benefit on EQT (by virtue of EQT's production and sale of his CBM); that EQT knew of the benefit and should reasonably have expected to pay Plaintiff for said benefit; and that EQT accepted and retained the benefit without paying for its value (EQT received millions of dollars from the production and sale of Plaintiff's and Class Members' CBM, but has never paid any monies to Plaintiff and Class Members).

EQT erroneously argues that Plaintiff cannot maintain a claim for unjust enrichment because an "express contract" exists between EQT and Plaintiff.  EQT fails to identify what that "express contract" is – with good reason, for there is no "express contract."  And it is precisely in such situations – where no express contract exists – that courts recognize the claim of unjust enrichment. As this Court has noted, "An unjust enrichment claim 'may not be brought in the face of an express contract,' **because the cause of action serves to aid plaintiffs who have not formally entered into a contract with a defendant**." *United States v. Universal Health*

47

*Services, Inc.*, 1:07CV000054, 2010 WL 2976080 (W.D. Va. July 28, 2010) (quoting *Acorn*

*Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir.1988) (emphasis added)). Because there is

no formal contract between Plaintiff and EQT, Plaintiff's unjust enrichment claim is entirely

proper.

    EQT's second erroneous argument is that Plaintiff cannot maintain the claim of unjust

enrichment because he has an adequate remedy at law. EQT's argument ignores the well-settled

principle that a plaintiff may plead alternative theories of recovery and, just as important, at this

stage of the litigation, it is improper to dismiss an unjust enrichment claim simply because

Plaintiff may have a remedy at law. *Park v. Am. Circuit Breaker Corp.*, 1:06CV00549, 2008 WL

4596234, *3 (M.D.N.C. Oct. 14, 2008) (denying motion to dismiss unjust enrichment claim

merely because plaintiff also alleged breach of contract) (citing  *Ellis v. Abbey & Ellis*, 294

A.D.2d 168, 170, 742 N.Y.S.2d 225, 228 N.Y.App.Div.2002) (noting that "[c]auses of action

and grounds for relief may be pleaded in the alternative" and a plaintiff may "plead both breach

of contract and quantum meruit as alternative theories of recovery"); *James River Equip., Inc. v.*

*Mecklenburg Utils., Inc.*, 179 N.C.App. 414, 419, 634 S.E.2d 557, 560 (2006) ("It is well-

established that '[l]iberal pleading rules permit  pleading in the alternative,' and that theories [for

breach of express contract and for quantum meruit] may be pursued in the complaint even if

plaintiff may not ultimately be able to prevail on both." (internal quotation omitted)).[14] Thus,

Plaintiff's unjust enrichment claim is appropriately pleaded. Further, at this stage of the

litigation, it would be improper to dismiss Plaintiff's unjust enrichment claim.

---

    [14] Plaintiff does not concede that unjust enrichment is solely an equitable remedy. Plaintiff's
unjust enrichment claim is most analogous "to the *assumpsit* actions of eighteenth century England,
which were 'indisputably law cases.'" *Dastgheib v. Genentech, Inc.*, 457 F. Supp. 2d 536, 543 (E.D. Pa.
2006) (quoting Dan B. Dobbs, *Law of Remedies: Damages-Equity-Restitution*, 378, 385 n.8 (1993)).
However, the Court need not reach this issue because, as the *Park* court ruled, an unjust enrichment claim
should not be dismissed at this stage of the litigation simply because a plaintiff may have an adequate
remedy at law.

Finally, as with many of Plaintiff's other claims, EQT argues that Plaintiff has not exhausted his administrative remedies. Plaintiff rebuts this argument in Section III(D), above.

### L.   Plaintiff Is Entitled To Punitive Damages.

Plaintiff has alleged that EQT's conduct as described in the Amended Complaint was willful and wanton, and therefore punitive damages are recoverable. (Amended Complaint ¶93) EQT admits that when a defendant's conduct in committing a tort is willful, punitive damages can be awarded. *Dunn Constr. Co. v. Cloney*, 278 Va. 260, 682 S.E.2d 943, 946-47. In light of the fact that the Court must take his allegations as true, Plaintiff should be entitled to pursue these claims, and EQT's motion to dismiss Plaintiff's punitive damages claims should be denied. *Iqbal*, 129 S.Ct. at 1949.

### M.   Plaintiff Is Entitled To Pursue Attorney's Fees.

EQT claims that because Virginia follows the American Rule, attorney's fees are not available in this case. (Brief at 33) While Virginia follows the American Rule, Virginia recognizes exceptions thereto. Relevant to the present case, the Virginia Supreme Court has allowed attorney's fees when the offending party has acted fraudulently. *See Prospect Dev. Co., Inc. v. Bershader*, 258 Va. 75, 92, 515 S.E.2d 291, 301 (1999) ("We hold that in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party. When deciding whether to award attorney's fees, the chancellor must consider the circumstances surrounding the fraudulent acts and the nature of the relief granted to the defrauded party.")

Plaintiff's factual allegations concerning EQT's conduct (e.g., Amended Complaint at ¶¶62-65, 82-83, 123-24) are sufficient to encompass a claim for actual fraud or constructive fraud. *See Bershader, supra*, 515 S.E.2d at 297 (elements of actual fraud and constructive fraud). These allegations must be taken as true and, therefore, EQT's argument must fail.

49

V.      **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny EQT's

motion to dismiss in its entirety.

Respectfully submitted,


Dated:  September 10, 2010                    ROBERT ADAIR

By:     *s/Larry D. Moffett                                .*
                                              Larry D. Moffett
                                              Daniel Coker Horton & Bell, P.A.
                                              265 North Lamar Blvd., Suite R
                                              P. O. Box 1396
                                              Oxford, MS 38655
                                              Telephone: (662) 232-8979
                                              Facsimile:  (662) 232-8940
                                              lmoffett@danielcoker.com

Peter G. Glubiak, Esq. (VSB 31271)            Don Barrett
Glubiak Law Office                            David M. McMullan, Jr.
11165 West River Road                         Brian Herrington
P.O. Box 144                                  Katherine B. Riley
Aylett, VA  23009                             Barrett Law Group, P.A.
Telephone:  (804) 769-1616                    404 Court Square North
Facsimile:   (804) 769-1897                   P.O. Drawer 927
glubiaklaw@aol.com                            Lexington, MS  39095
                                              Telephone:  (662) 834-2488
                                              Facsimile:   (662) 834-2628
                                              dbarrett@barrettlawoffice.com
                                              dmcmullan@barrettlawoffice.com
                                              bherrington@barrettlawgroup.com
                                              kbriley@barrettlawoffice.com

David S. Stellings                            Elizabeth J. Cabraser
Steven E. Fineman                             Lieff Cabraser Heimann
Jennifer Gross                                 & Bernstein, LLP
Lieff Cabraser Heimann                        275 Battery Street
 & Bernstein, LLP                             San Francisco, CA 94111
250 Hudson Street, 8th Floor                  Telephone:  (415) 956-1000
New York, NY 10013                            ecabraser@lchb.com
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592
dstellings@lchb.com
sfineman@lchb.com
jgross@lchb.com

Elizabeth Alexander
Lieff Cabraser Heimann
  & Bernstein, LLP
One Nashville Place
150 Fourth Avenue North
Suite 1650
Nashville, TN 37219
Telephone:  (615) 313-9000
Facsimile: (615) 313-9965
ealexander@lchb.com

Charles F. Barrett
6518 Highway 100, Suite 210
Nashville TN 37205
Telephone: (615) 515.3393
Facsimile: (615) 515.3395
charles@cfbfirm.com

Richard R. Barrett
Law Offices of Richard R. Barrett, PLLC
1223 Jackson Avenue, Suite 203
Oxford, MS 38655
Telephone: (662) 307-7000
rrb@rrblawfirm.net

Jackson S. White, Jr., VSB #03677
The White Law Office
P. O. Box 286
Abingdon, VA 24212
Telephone: (276) 619-3831
Facsimile:  (866) 516-5655
jackwhite@whitelawoffice.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned counsel does hereby certify that he has this day served a true and correct copy of the above and foregoing upon all counsel of record via ECF notification and/or by e-mail

 Wade W. Massie, VSB # 16616
 Mark E. Frye, VSB #32258
 Penn Stuart & Eskridge
 P. O. Box 2288
 Abingdon, VA 24212
 T: 276.628.5151
 F: 276.628.5621
 wmassie@pennstuart.com
 mfrye@pennstuart.com

 W. Thomas McGough, Jr.
 Reed Smith, LLP
 Reed Smith Centre
 225 Fifth Avenue
 Pittsburgh, Pennsylvania 15222
 T: 412.288.3131
 F: 412.288.3063
 wmcgough@reedsmith.com

 Stephen R. McCullough, VSB #41699
 Earle Duncan Getchell, Jr., VSB #14156
 Stephen M. Hall, VSB #44132
 Office of the Attorney General
 900 East Main Street
 Richmond, VA 23219
 T: 804.786.2436
 F: 804.786.1991
 smccullough@oag.state.va.us
 dgetchell@oag.state.va.us
 shall@oag.state.va.us

and that I mailed by United States Postal Service the document to the following non-CM/ECF participants:

 Arthur Amos
 Abbie Lambert Amos
 221 Bluffield Lane
 Lancaster, VA 22503

 C. W. Dotson
 Mary Frances Dotson
 390 Oakmont Drive
 Abingdon, VA 24211

Arlie J. Lambert
491 Lake Point Drive
Piney Flats, TN 37686-4517

Greg Lambert
20387 Delano Drive
Abingdon, VA 24210

Lambert Land LLC
c/o Dennis Sutherland
Route 63, Lambert Building
Nora, VA 24272

Linda Lambert Loftin
808 Wright Avenue
Chesapeake, VA 23324

Harris McGirt
4020 E. Shorewood Drive
Hernando, FL 34442-3860

Joan Lambert McGirt
6868 Bayshore Drive
Lantana, FL 33462

G. Worth Pegram, Jr.
Bernice Lambert Pegram
3100 Shore Drive, Apt. 921
Virginia Beach, VA 23451-1162

Don Rainey
Linda Carol Rainey
7252 Timberland Drive
Radford, VA 24141

Jerry Short
Rose Lambert Short
6023 Westwood Ter B
Norfolk, VA 23508-1138

Dennis Sutherland
Charlotte Sutherland
20132 Judith Way
Abingdon, VA 24211

This the 10th day of September, 2010.

　　　　　　　　　　　　　 _s/ Larry D. Moffett_　　　　　　
　　　　　　　　　　　　　Larry D. Moffett
　　　　　　　　　　　　　Attorney for Plaintiff