# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF VIRGINIA
# Abingdon Division

| | |
|---|---|
| ROBERT ADAIR, on behalf of himself and all others similarly situated,<br>    Plaintiff,<br><br>v.<br><br>EQT PRODUCTION COMPANY et al.,<br>    Defendants. | **MEMORANDUM OPINION**<br>Case No. 1:10cv00037 |

This matter is before the undersigned on the Plaintiff's Motion To Regulate Defendant EQT Production Company's Contact With Putative Class Members, (Docket Item No. 201) ("Motion"). The Motion was heard by the undersigned on June 7, 2011. Based on the arguments and representations of counsel, and for the reasons stated below, I will grant the Motion in part.

## I. Background

The plaintiff, Robert Adair, sues on behalf of himself and others similarly situated. Adair sues EQT Production Company, (formerly known as Equitable Production Company and Equitable Resources Energy Company) ("EQT"), and other known and unknown coal estate owners. The Amended Complaint alleges that the proposed class members own certain gas estate interests in coalbed methane, ("CBM"), gas fields in Dickenson, Buchanan, Lee, Russell, Scott and Wise counties in Virginia, and are entitled to payments from EQT as "deemed" lessors under forced-pooling orders of the Virginia Gas and Oil Board, ("Board").

1

The defendants have filed motions to dismiss, which are pending before the district judge on cross objections to the undersigned's Report and Recommendation granting in part and denying in part the motions. The matter also is before the undersigned on the plaintiff's motion for class certification. The court has delayed ruling on the motion for class certification pending its ruling on the motions to dismiss. The motion for class certification seeks to certify the following class:

> Each person and entity who has been identified by EQT Production Company or its predecessor(s)-in-interest as an "unleased" owner of the gas estate or gas interests in a tract included in a coalbed methane gas unit operated by EQT Production Company in any of the Subject Virginia counties, and whose ownership of the coalbed methane gas attributable to that tract has been further identified by EQT Production Company as being in conflict with a person(s) or entity(ies) owning the coal estate or coal interests in the tract or coalbed methane interests allegedly derived from coal estate or coal interests in the tract, according to filings made by EQT Production Company with the Virginia Gas and Oil Board and/or according to orders entered by the Virginia Gas and Oil Board pursuant to EQT Production Company's filings. The Class excludes (a) the Defendants, and (b) any person who serves as a judge in this civil action and his/her spouse. Excluded from the Class claims are all purportedly conflicting claims pertaining to those tracts/parcels that are comprised of railroads or public roads.

When the Virginia General Assembly enacted the Virginia Gas and Oil Act, VA. CODE ANN. §§ 45.1-361.1, et seq., ("Gas Act"), in 1990, there was uncertainty in Virginia as to whether CBM was owned by landowners who retained rights to the gas estate/interest or by those who owned the coal estate/interest in the land. The Gas Act facilitated the drilling and

2

production of CBM, without waiting for the CBM ownership issue to be decided, by allowing for the forced-pooling of CBM interests with conflicting claims of ownership into drilling units. In drilling units where there are conflicting claims of ownership of the CBM or where the owners of the CBM are unknown or could not be located, the Gas Act requires the gas well operators to deposit any funds due to these interests into escrow, to be held pending identification and location of the owner or a final agreement or determination as to ownership of the CBM estate/interest. *See* VA. CODE ANN. §§ 45.1-361. 21, 45.1-361.22. Thus, with regard to conflicting claims, a claimant must either enter into an agreement with all other claimants or receive a court determination regarding ownership of the CBM at issue before he may receive any escrowed royalties.

This case and the other related CBM cases currently before this court seek, in part, a determination as to the ownership of the CBM. For years, coal owners and some CBM well operators have encouraged CBM claimants to enter into what have been called "split agreements" to get their money out of escrow. Under these agreements, coal and gas owners agree to split the royalties held in escrow and/or future royalties. The Motion seeks to prevent EQT from soliciting any of these split agreements from potential class members pending the resolution of this litigation.

Plaintiff's counsel have offered a number of affidavits in support of the Motion from purported CMB owners in EQT-operated drilling units throughout southwest Virginia. These include affidavits from Eva Mae Adkins, a named plaintiff in one of the related CBM cases currently pending before the court, Mary Mayes, Lehman L. Tiller, Michael Price and Peggy

Leonard. These affiants state that they were contacted at times varying from 2005 to 2010 by someone who represented themselves as either an employee or representative of EQT and who sought to obtain CBM leases and/or split agreements from them. All of these affiants state that the EQT agents actually visited them at their homes. According to these affiants, the EQT agents represented to them that executing split agreements was the only way to receive any CBM royalties out of escrow. These affiants also state that no EQT agent ever advised them regarding the Virginia Supreme Court's 2004 opinion in *Harrison-Wyatt, LLC v. Ratliff,* 593 S.E.2d 234 (Va. 2004), holding that a conveyance of a coal estate alone did not convey the rights to the CBM.

Plaintiff's counsel also has produced evidence that, between 2005 and 2008, EQT sent letters to CBM owners stating, "at the present time, the ownership of CBM as between the coal owner and the gas owner has not been judicially determined in the Commonwealth of Virginia." These letters did not mention the Virginia Supreme Court's decision in 2004 in *Harrison-Wyatt LLC, v. Ratliff.*

In opposition to the Motion, EQT has filed an affidavit from Rita McGlothlin-Barrett.[1] McGlothlin-Barret states that she worked with EQT as Landman IV, with responsibility for lease acquisitions and regulatory filings from 2005 to 2010, and as Regional Land Manager, with responsibility for all land activities in Virginia from April 2010 to April 2011. McGlothlin-

---

[1] EQT also has filed affidavits from Thomas Y. Dotson and Michael D. Abbott. I do not address the information contained in these affidavits because I do not consider it relevant. *See infra* n.2.

Barrett denies that EQT has made any effort to limit the size of the class in this action by obtaining split agreements with putative class members. In particular, she states: "EQT land personnel continued to follow the same practices and procedures they followed before this case was filed."

## II. Analysis

As stated above, the Motion seeks to prevent EQT from soliciting split agreements from putative class members pending resolution of this litigation. A district court has the power to restrict communications between a party and putative class members before a class is certified. *See Gulf Oil Co. v. Bernard* 452 U.S. 89, 100 (1991). This power is not absolute, however, and any order which limits a party's ability to communicate with putative class members "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co.,* 452 U.S. at 101*; see also Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1226-27 (S.D. Ala. 2008). Any limitation imposed must be set out in "a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Gulf Oil Co.,* 452 U.S. at 102. Courts have applied this standard to communications between defendants and putative class members. *See The Kay Co., LLC v. Equitable Prod. Co.*, 246 F.R.D. 260, 262 (S.D. W.Va. 2007) (citing *Keystone Tobacco Co. v. U.S. Tobacco Co.*, 238 F. Supp. 2d 151, 154 (D.D.C. 2002)).

Under the relevant case law, a court must first consider whether a limitation is necessary to protect the rights of the parties. Only after

5

determining that a limitation is necessary, should the court attempt to properly craft the limitation to be imposed. *See The Kay Co.*, 246 F.R.D. at 262-63. In determining whether a limitation is necessary, "[t]wo kinds of proof are required. First, the movant must show that a particular form of communication has occurred or is threatened to occur. Second, the movant must show that the particular form of communication at issue is abusive in that it threatens the proper functioning of the litigation." *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697-98 (S.D. Ala. 2003). "Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Cox Nuclear Med.*, 214 F.R.D. at 698 (footnotes omitted); *see also Longcrier*, 595 F. Supp. 2d at 1227 (federal courts may limit communications with putative class members where a party has engaged in misleading or coercive behavior). The movant, however, does not have to show that actual harm has occurred. *See The Kay Co.*, 246 F.R.D. at 263.

In this case, it is unrefuted that representatives of EQT have been contacting purported CBM owners for years and urging them to enter into split agreements with coal owners. By McGlothlin-Barrett's admission, EQT continues in this conduct. While none of the affiants before the court now would qualify as a member of the requested class, at least one of them might have been a class member, but for executing a split agreement as proposed by EQT. Therefore, the court finds that should EQT continue in this conduct, it will likely be contacting putative class members.

It also is unrefuted that certain of these communications have contained false information. In particular, evidence is before the court that agents of EQT have misrepresented that the only way a CBM owner whose interest is subject to a competing claim can obtain payment of escrowed or future CBM royalties is to enter into a split agreement.[2] Furthermore, the evidence before the court is that these contacts are often unsolicited and occur at the CBM owners' residences, which, the court notes, has a potential to be more coercive than contact by telephone or through the mail. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 465 (1978). Thus, the court finds that EQT has made abusive communications in the past and, by its own admission, continues in these efforts.

The court further finds that action is necessary to protect putative class members from unwittingly giving up any right to relief they may obtain through this case based on false information provided by EQT. Plaintiff's counsel seek to certify this matter as a class action made up of all forced-pooled CBM owners whose royalties have been escrowed by EQT because of competing claims of ownership. Through this case, plaintiff seeks a declaratory judgment under Virginia law that CBM and CBM royalties belong to the gas estate owners and not the coal estate owners. If potential class members enter into voluntary agreements regarding the ownership of the CBM, they necessarily would give up any right to receive a court determination of this issue through this, or any other, litigation.

---

[2] Plaintiff's counsel also assert that EQT has misled CBM owners by not informing them of the Virginia Supreme Court's 2004 decision in *Harrison-Wyatt, LLC*. The holding and legal effect of that decision is one of the issues before this court in this litigation. That being the case, the court cannot at this time determine that failing to notify CBM claimants of that decision would mislead them.

Specifically weighing the need for action to protect the putative class members' rights against the potential interference with EQT's rights, the court finds that it can craft a narrowly drawn order that limits EQT's protected speech as little as possible. False statements are not protected speech. *See Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983) ("false statements are not immunized by the First Amendment right to freedom of speech."); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("there is no constitutional value in false statements of fact."). Thus, the undersigned will grant the motion in part and deny the motion in part and enter an order that prohibits EQT from providing any false information to any putative class members in its effort to obtain split agreements from them. This order will specifically state that EQT may not falsely inform putative class members that the only way they can obtain payment of escrowed or future CBM royalties is to enter into a split agreement. The order will further state that, if EQT provides any information to a putative class member regarding how to obtain payment of escrowed royalties or future royalties, EQT will inform the putative class member that he may enter into a voluntary split agreement or seek a legal determination of ownership from a court and will inform the putative class member of the fact that this case is pending in this court. To ensure that EQT abides by the court's order, the court will require all future contact with putative class members by EQT in an effort to obtain split agreement to be in writing to allow later review by the court, if necessary.

An appropriate order will be entered.

ENTERED this 29th day of July, 2011.

                                         /s/ *Pamela Meade Sargent*
                                                UNITED STATES MAGISTRATE JUDGE